## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| JONAS D. MITCHELL | § | Case No. 23-43130-mxm7 |
| | § | |
| Debtor. | § | Chapter 7 |
| | § | |
| CADENCE BANK, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 24-_____ |
| | § | |
| JONAS D. MITCHELL, | § | |
| | § | |
| Defendant. | § | |

## COMPLAINT OF CADENCE BANK OBJECTING TO THE DISCHARGEABILITY OF DEBT UNDER 11 U.S.C. 523

Cadence Bank (the "Creditor" or "Plaintiff"), by and through its undersigned counsel, files this Adversary Complaint (the "Complaint") against Jonas D. Mitchell (the "Debtor" or "Defendant") pursuant to 11 U.S.C. § 523 requesting the determination that certain debts of the Debtor are excepted from discharge pursuant to 11 U.S.C. § 523(a)(4) and 523(a)(6), and Rules 4004(d), 7001(4), and 7003 of the Federal Rules of Bankruptcy Procedure. In support of this Complaint, Plaintiff avers as follows:

## THE PARTIES

1.      Plaintiff is Cadence Bank having offices at 201 S. Spring Street, Tupelo, MS 38804-4811.  Plaintiff is a creditor of the Debtor.

2.      Jones D. Mitchell is the Debtor in the above-captioned bankruptcy case and is an adult individual who resides at 2944 La Roda, Grand Prairie, TX 75054.

## JURISDICTION, VENUE, & STANDING

3.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and 11 U.S.C. § 523 and 727.

4.      This adversary proceeding has been referred to this Court pursuant to 28 U.S.C. § 157(a).

5.      This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

6.      Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. § 1409(a).

7.      Plaintiff has standing as a creditor under 11 U.S.C. § 101(5)(A) and 11 U.S.C. § (10)(A).[1]

---

[1] Plaintiff is a creditor who has a secured claim against the Debtor.  *See* 11 U.S.C. § 101(5)(A) (defining a claim as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured"), (10)(A) (providing that under the Bankruptcy Code, a creditor is defined as "an entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor"). Thus, Plaintiff has standing to object to dischargeability.  *See id.* § 523(c); *Fezler v. Davis (In re Davis)*, 194 F.3d 570, 574 (5th Cir. 1999) (noting that an action except debt from discharge must be brought by a creditor); *Guerriero v. Kilroy (In re Kilroy)*, 354 B.R. 476, 488 (Bankr. S.D. Tex. 2006) (concluding the same).

## PROCEDURAL BACKGROUND

8.      On October 13, 2023, the Debtor filed a voluntary petition for relief pursuant to Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division, at Case No. 23-43130-mxm7.

9.      On April 8, 2024, this Court entered an *Unopposed Order Granting Third Motion to Extend Deadlines to Object to Debtor's Discharge and/or to the Dischargeability of Debts*. The deadline to file a complaint was extended until April 30, 2024.

## FACTUAL ALLEGATIONS

10.     Prior to filing the Petition, the Debtor owned a transportation business named JD Mitchell Transportation, LLC, within the State of Texas.

11.     Debtor owns 100% of JD Mitchell Transportation, LLC. Debtor is the sole and managing member of J.D. Mitchell Transportation LLC. Debtor has a primary role in directing and managing the operations of the business.

12.     As part of the SBA loan process, Debtor signed a U.S. Small Business Administration Authorization on September 28, 2022 (the "Authorization"). The Authorization is attached hereto as **Exhibit A**. The Authorization provides that the loan proceeds of $172,976.17 be used for "working capital". Appendix A of the Authorization specifically provides:

PLAINTIFF CADENCE BANK'S COMPLAINT FOR DETERMINATION THAT
CERTAIN DEBTS ARE EXCEPTED FROM DISCHARGE                                    PAGE 3 OF 13

*"C.   Borrower and Operating Company certify that they will not, without Lender's prior written consent:*

*1.   Distributions (MANDATORY) – Make any distribution of company assets that will adversely affect the financial condition of Borrower and/or Operating Company.*

*3.  Transfer of Assets (MANDATORY) – Sell, lease, pledge, encumber (except by purchase money liens on property acquired after the date of the Note), or otherwise dispose of any of Borrower's property or assets except in the ordinary course of business."*

13.     Attached hereto and marked as **Exhibit B** is a copy of a U.S. Small Business Administration Note dated September 28, 2022, in the principal sum of $175,000.00 executed by JD Mitchell Transportation, LLC (the "SBA Loan").  Plaintiff is the current owner and holder of the SBA Loan.  The SBA Loan is secured by a Security Agreement dated September 28, 2022 (the "Security Agreement").   The Security Agreement is attached hereto as **Exhibit C** and incorporated herein as if fully copied and set forth at length.  The collateral referenced in the Security Agreement are: "All Business Assets including But Not Limited To All Inventory, Chattel Paper, Accounts, Equipment, Furniture and General Intangibles of The Business known as JD MITCHELL TRANSPORTATION LLC located at 2944 La Roda Grand Prairie, TX 75054 or located elsewhere."  Plaintiff perfected a lien on the collateral stated in the Security Agreement by filing a UCC Financing Statement with the Texas Secretary of State (the "Financing Statement"), which is attached hereto as **Exhibit D** and incorporated herein by reference

as if fully copied and set forth at length. The SBA Loan is further secured by the Unconditional Guarantee signed by Debtor which is attached as **Exhibit E.**

14.    In addition, the parties entered into a Loan Agreement which set forth the terms and conditions for the SBA Loan and repayment.  A copy of the Loan Agreement is attached hereto as **Exhibit F** and incorporated herein by reference as if fully copied and set forth at length.

15.    On October 6, 2023, Plaintiff notified JD Mitchell Transportation, LLC that the company was in default under the SBA Loan.  In its October 6, 2023 notice, Plaintiff informed JD Mitchell Transportation, LLC that the debt had been accelerated and demanded payment of the principal amount of $167,892.80, plus accrued interest in the amount of $6,228.36, with a per diem in the amount of $52.47 from October 5, 2023, plus late fees in the amount of $361.14. A copy of the demand letter is attached hereto as **Exhibit G.**

16.    On October 13, 2023, JD Mitchell Transportation, LLC filed a voluntary petition for relief pursuant to Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division, at Case No. 23-43131-elm7.

17.    Also on October 13, 2023, the Debtor filed his voluntary petition for relief pursuant to Chapter 7 of the Bankruptcy Code.

18.     On April 16, 2024, Plaintiff examined the Debtor pursuant to Bankruptcy Rule 2004 and the Federal Rules of Civil Procedure.

19.     At the 2004 examination, Debtor testified that all proceeds from the SBA Loan were used for business purposes for J.D. Mitchell Transportation LLC. The Debtor previously testified at the 341 Meeting of Creditors that the SBA Loan proceeds were used for operating capital and vehicle repairs.

20.     At the April 16, 2004 examination, Debtor produced a number of bank statements, including a statement for JD Mitchell Transportation, LLC from Navy Federal Credit Union showing transactions from 09/01/2022 through 09/30/2022.  This bank statement indicated that two withdrawals were made by check on September 30, 2022, two days after the funding of the SBA loan.  One of the withdrawals was in the amount of $30,600.00, and the second was in the amount of $62,500.00.  Handwritten on the bank statement that Debtor produced was the following: "Paid to J. Mitchell" next to the $30,600.00 withdrawal and "Paid to V. Mitchell" next to the $62,500.00 withdrawal.  The statement is attached as **Exhibit H.**

21.     At the April 16, 2004 examination, Debtor was asked repeatedly about the $30,600.00 and $62,500.00 withdrawals by check.  The Debtor was unable to explain how these funds were used.  The Debtor ultimately stated that his wife handled the affairs of the business and that she would have to explain it.

22.     The Debtor has not adequately explained what happened to the $30,600.00 and $62,500.00 withdrawals.

23.     Upon information and belief, Debtor used $30,600.00 and $62,500.00 for personal use and to pay personal debt without providing any goods or services to JD Mitchell Transportation, LLC.  This use of funds is in direct violation of the Authorization and the Loan Agreement.  It also contradicts the testimony of the Debtor at the 341 meeting of creditors.

24.     The aforesaid acts constitute embezzlement under 11 U.S.C. § 523(a)(4) and willful and malicious injury under 11 U.S.C. § 523(a)(6), which prevents the Debtor from discharging Plaintiff's debt under 11 U.S.C. § 727.

## COUNT 1
## NON-DISCHARGEABILITY OF DEBTOR'S DEBTS PURSUANT TO 11 U.S.C. § 523(a)(4)

25.     Plaintiff repeats and re-alleges each and every statement contained in the preceding paragraphs as if fully set forth at length herein.

26.     11 U.S.C. § 523(a)(4) prohibits the discharge of a debt when there is "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  11 U.S.C. § 523(a)(4).

27.     "Embezzlement is defined for purposes of § 523(a)(4) as the fraudulent appropriation of property by a person to whom such property has been entrusted, or into

whose hands it has lawfully come." *Miller v. J.D. Abrams Inc. (Matter of Miller)*, 156 F.3d

598, 602 (5th Cir. 1998), *cert. denied*, 526 U.S. 1016, 119 S. Ct. 1249, 143 L. Ed. 2d 347 (1999).

28.    Embezzlement has three elements:  (1) appropriation of funds by the

Debtor; (2) for the debtor's use or benefit; and (3) with fraudulent intent.  *Andra Group,*

*L.P. v. Gamble-Ledbetter (In re Gamble-Ledbetter)*, 419 B.R. 682, 696 (Bankr. E.D. Tex. 2009)

(citing *Rainey v. Davenport (In re Davenport)*, 353 B.R. 150, 200 (Bankr. S.D. Tex. 2006)).

29.    Fraudulent intent is "an intent to deceive another person and thereby

induce such other person to transfer, alter or terminate a right with respect to property."

*Winn v. Holdaway (In re Holdaway)*, 388 B.R. 767, 778 (Bankr. S.D. Tex. 2008).

30.    "Fraudulent intent may be inferred from the conduct of the Debtor and

from circumstances of the situation."  *Chizk v. Ramon (In re Ramon)*, 433 B.R. 571, 582

(Bankr. N.D. Tex. 2010).

31.    JD Mitchell Transportation, LLC entered into a Loan Agreement with

Creditor and signed documents in connection with the loan and received the proceeds

from the SBA Loan.

32.    Debtor owns 100% of JD Mitchell Transportation, LLC, and is the President

and sole member of the company.

33.    JD Mitchell Transportation, LLC's bank statement from Navy Federal

Credit Union dated 09/01/2022 through 09/30/2022 shows that two withdrawals were

made by check on September 30, 2022, two days after the SBA Loan was funded.  One

withdrawal was in the amount of $30,600.00, and the second withdrawal was in the amount of $62,500.00.

34.    Handwritten on JD Mitchell Transportation, LLC's September 2022 bank statement next to the $30,600.00 withdrawal was the notation, "Paid to J. Mitchell." Debtor testified at the 2004 examination that this notation was made by his wife.

35.    Handwritten on JD Mitchell Transportation, LLC's September 2022 bank statement next to the $62,500.00 withdrawal was the notation, "Paid to V. Mitchell." Debtor testified at the 2004 examination that this notation was made by his wife.

36.    The Debtor has failed to produce any evidence demonstrating that either withdrawal was used for legitimate purposes for JD Mitchell Transportation, LLC.

37.    To date, the Debtor cannot account for the $30,600.00 and $62,500.00 withdrawals that were paid to the Debtor and his wife, V. Mitchell, two days after the SBA Loan was funded.

38.    Accordingly, based on the circumstances of the situation, this Court can infer that the Debtor appropriated funds for his personal use with fraudulent intent, thereby constituting embezzlement under 11 U.S.C. § 523(a)(4).

WHEREFORE, pursuant to 11 U.S.C. § 523(a)(4), Plaintiff requests that the sum of $93,100.00 be deemed non-dischargeable, along with such other amounts used by Debtor from the SBA Loan for non-legitimate business purposes.

## COUNT 2
## NON-DISCHARGEABILITY OF DEBTOR'S DEBTS PURSUANT TO 11 U.S.C. § 523(a)(6)

39.     Plaintiff repeats and re-alleges each and every statement contained in the preceding paragraphs as if fully set forth at length herein.

40.     11 U.S.C. § 523(a)(6) prohibits the discharge of a debtor when there is "willful or malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).

41.     For conduct to qualify as willful and malicious, the debtor must inflict a deliberate or intentional injury, not merely take a deliberate or intentional act that leads to injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 64, 118 S. Ct. 974, 140 L. Ed. 2d 90 (1998).

42.     An injury is willful or malicious when there is either (1) an objective substantial certainty of harm arising from a deliberate or intentional action, or (2) a subjective motive to cause harm by a party taking a deliberate or intentional action. *In re Miller)*, 156 F.3d at 604-06.

43.     "Injuries covered by section 523(a)(6) are not limited to physical damage or destruction; harm to personal or property rights is also covered by section 523(a)(6)." *In re Gamble-Ledbetter*, 419 B.R. at 698-99. "'Willful conversion of another's property falls within section 523(a)(6).'" *Id.* at 699 (quoting *Int'l Beauty Prods., LLC v. Beveridge (In re Beveridge)*, 416 B.R. 552, 571 (Bankr. N.D. Tex. 2009)).

44.     Courts may infer that a debtor acted with malice, for purposes of section 523(a)(6), if the debtor acts "in a manner which one knows will place the lender at risk, such as converting property in which the lender holds a security interest." *Theroux v. HSA Mortg. Co. (In re Theroux)*, 49 F.3d 728, 1995 WL 103342, at *3 (5th Cir. 1995) (per curiam).

45.     Plaintiff is the current owner and holder of the $175,000 SBA Loan executed by JD Mitchell Transportation, LLC.  The SBA Loan is secured by a Security Agreement dated September 28, 2022.  Plaintiff perfected a lien on the collateral stated in the Security Agreement by filing a UCC Financing Statement with the Texas Secretary of Texas, and the SBA Loan is further secured by an Unconditional Guarantee signed by the Debtor.  In contemplation for the SBA Loan and Security Agreement, the parties entered into the Authorization and Loan Agreement, which set forth the terms and conditions for the use of the loan proceeds.

46.     Despite Plaintiff's security interest, the Debtor willfully and maliciously converted a sum of $93,100 of the proceeds from the SBA Loan.  Specifically, JD Mitchell Transportation, LLC's bank statement from Navy Credit Federal Credit Union dated 09/01/2022 through 09/30/2022 shows that two withdrawals were made by check on September 30, 2022, two days after the SBA Loan was funded.  One withdrawal was in the amount of $30,600.00, and the second withdrawal was in the amount $62,500.00.

47.     Handwritten on JD Mitchell Transportation, LLC's September 2022 bank statement next to the $30,600.00 withdrawal was the notation, "Paid to J. Mitchell." Debtor testified at the 2004 examination that this notation was made by his wife.

48.     Handwritten on JD Mitchell Transportation, LLC's September 2022 bank statement next to the $62,500.00 withdrawal was the notation, "Paid to V. Mitchell." Debtor testified at the 2004 examination that this notation was made by his wife.

49.     The Debtor has failed to produce any evidence demonstrating that either withdrawal was used for legitimate purposes for JD Mitchell Transportation, LLC.

50.     To date, the Debtor cannot account for the $30,600.00 and $62,500.00 withdrawals that were paid to the Debtor and his wife, V. Mitchell, two days after the SBA Loan was funded.

51.     Because the Debtor cannot show that the $30,600.00 and $62,500.00 withdrawals made two days after securing the loan from Plaintiff were used for legitimate purposes for JD Mitchell Transportation, LLC, rather than personal use, the Court can infer that the Debtor willfully and maliciously converted property in which Plaintiff has a security interest.

WHEREFORE, pursuant to 11 U.S.C. § 523(a)(6), Plaintiff requests that the sum of $93,100.00 be deemed non-dischargeable, along with such other amounts used by Debtor from the SBA Loan for non-legitimate business purposes.

## PRAYER

**WHEREFORE**, Plaintiff respectfully requests this Court enter a Judgment against the Debtor (1) determining that the amount of $93,100.00 is nondischargeable under Bankruptcy Code § 523(a)(4) and/or § 523(a)(6); (2) determining that any other amount of the SBA Loan not used for legitimate business purposes as provided in the loan documents be deemed nondischargeable under Bankruptcy Code § 523(a)(4) and/or § 23(a)(6); and (3) granting any and all such other and further relief that the Court deems just and proper.

Respectfully submitted,

HALEY & OLSON, P.C.

BY: */s/ Blake Rasner*
Blake Rasner
Texas Bar No. 16555700
100 N. Ritchie Rd., Ste. 200
Waco, Texas 76712
Ph.:    (254) 776-3336
Fax:    (254) 776-6823
Email: brasner@haleyolson.com

*Attorney for Cadence Bank*

# EXHIBIT A

DocuSign Envelope ID: 6D1A6379-A0B4-40C8-AF90-1D96EFCBA0A7

This is a copy view of the Authoritative Copy held by the designated custodian

U.S. Small Business Administration

**AUTHORIZATION**

**(SBA *Small Loan Advantage* LOAN – For use by PLP Lenders only)**

SBA Loan# 4212419100

U.S. Small Business Administration **Dallas/Fort Worth District Office** Lender:
**150 Westpark Way, Suite 130** **Cadence Bank**
**Euless, TX 76040** **201 S Spring St**
**Tupelo, MS 38804-4811**

SBA approves, under Section 7(a) of the Small Business Act as amended, Lender's application, received ___August 1, 2022___, for SBA to guarantee _75%_ of a Small Loan Advantage loan in the amount of $ _175000.00_ to be made by Lender to:

Borrower: JD Mitchell Transport LLC

2944 La Roda, Grand Prairie, TX 75054

**A. The GUARANTEE FEE IS:** $ _0.00_

Lender must pay the guarantee fee within 90 days of the approval date of this Authorization. Failure to timely pay the guarantee fee will result in cancellation of the SBA guarantee. The 90-day deadline may not be extended. Lenders are required to make their payments electronically. Payment can be made at www.pay.gov or by ACH if they have previously enrolled with the SBA. No part of the guarantee fee is refundable if Lender has made any disbursement. Lender may collect this fee from Borrower after initial disbursement of Loan; however, when an escrow closing is used, Lender may not collect the fee until all Loan funds have been disbursed to the Borrower from the escrow account. Borrower may use Loan proceeds to reimburse Lender for the guarantee fee.

For loans with a maturity of 12 months or less, Lender must pay the guarantee fee within 10 business days from the date the SBA loan number is assigned and before signing this Authorization. No guarantee exists if Lender has not timely paid the guarantee fee in full. SBA will not refund the guarantee fee after the date of this Authorization except as provided in SOP 50 10. Payment of the guarantee fee is not contingent upon disbursement. Lender may collect this fee from Borrower upon receipt of the SBA loan number. Borrower may use loan proceeds to reimburse Lender for the guarantee fee.

**For loans of $150,000 or less,** Lender may retain 25% of the guarantee fee but must remit the remainder to SBA.

**B. ONGOING GUARANTEE FEE (LENDER'S ANNUAL SERVICE FEE)**

Lender agrees to pay SBA an ongoing guarantee fee equal to _0%_ per year of the guaranteed portion of the outstanding balance. Lender may not charge or otherwise pass through this fee to Borrower.

**C. IT IS LENDER'S SOLE RESPONSIBILITY TO:**

1. Close the Loan in accordance with the terms and conditions of this Authorization.

2. Obtain valid and enforceable Loan documents, including obtaining the signature or written consent of any obligor's spouse if such consent or signature is necessary to bind the marital community or create a valid lien on marital property.

3. Retain all origination, closing, servicing and liquidation documents. Lender must submit these documents, to SBA for review if Lender requests SBA to honor its guarantee on the Loan, or at any time SBA requests the documents for review.

DocuSign Envelope ID: 8D7AC279-A0B8-40C8-A197-4D96EFCDA0A7

This is a copy view of the Authoritative Copy held by the designated custodian

4. Lender must have a valid SBA Loan Guarantee Agreement (SBA Form 750 and 750B for short term loans, if applicable), and a valid Supplemental Guarantee Agreement – Preferred Lenders Program (PLP) (SBA Form 1347).

 D.  **CONTINGENCIES**—SBA issues this Authorization in reliance on representations in the Loan application, including supporting documents. The guarantee is contingent upon Lender:

1. Having paid the full guarantee fee in the time and manner required by this Authorization and the SBA Standard Operating Procedures (SOP) 50 10;

2. Complying with the current SOP 50 10 and all applicable appendices;

3. Making first disbursement of the loan no later than **twelve** months, and complete disbursement no later than **twelve** months, from the date of this Authorization. In all cases, the loan must be fully disbursed within 48 months of approval or any undisbursed portion will be cancelled;

4. Having no evidence since the date of the Loan application, or since any preceding disbursement, of any un-remedied adverse change in the financial condition, organization, management, operation, or assets of Borrower, Operating Company, or its Associates which would warrant withholding or not making any further disbursement; and

5. Satisfying all of the conditions in this Authorization.

E. **NOTE TERMS**:

Lender must have borrower execute a Note containing the following repayment terms:

> **Maturity**: This Note will mature in **120 months** from date of Note.

> **Repayment Terms:**

> **The interest rate on this Note will fluctuate.  The initial interest rate is  8.25  % per year.  This initial rate is the Prime Rate in effect on the first business day of the month in which SBA receives the loan application, plus  2.75  %. The initial rate must remain in effect until the first change period begins unless reduced in accordance with SOP 50 10.**

> The interest rate will be adjusted every calendar quarter (the "change period").

> The "Prime Rate" is the Prime Rate in effect on the first business day of the month (as published in the Wall Street Journal newspaper) in which SBA received the application, or any interest rate change occurs. Base Rates will be rounded to two decimal places with .004 being rounded down and .005 being rounded up.

> The adjusted interest rate will be  2.75  % above the Prime Rate. Lender will adjust the interest rate on the first calendar day of each change period. The change in interest rate is effective on that day whether or not Lender gives Borrower notice of the change.  **The change period begins October 1, 2022.**

> Lender may use the SBA Note (SBA Form 147) or its own note form.    If the lender uses its own note form, the lender must ensure that the note is legally enforceable and assignable, has a stated maturity and is not payable on demand.  In addition, if the lender uses its own note form, the note must include the following language: *"When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law."*

DocuSign Envelope ID: 80FA6FF9-A0B8-48C8-AF97-4D86EFC9BB47

This is a copy view of the Authoritative Copy held
by the designated custodian

Borrower must pay principal and interest payments of $2,077.28 every month, beginning two months from the month this Note is dated; payments must be made on the second calendar day in the months they are due.

The interest rate identified in the Note may not be changed during the life of the loan unless changed in accordance with SOP 50 10.

Lender will apply each installment payment first to pay interest accrued to the day Lender received the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.
Loan Prepayment: Notwithstanding any provision in this Note to the contrary:

Borrower may prepay this Note. Borrower may prepay 20 percent or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20 percent and the Loan has been sold on the secondary market, Borrower must:    a. Give Lender written notice; b. Pay all accrued interest; and c. If the prepayment is received less than 21 days from the date Lender received the notice, pay an amount equal to 21 days interest from the date lender received the notice, less any interest accrued during the 21 days and paid under b. of this paragraph. If Borrower does not prepay within 30 days from the date Lender received the notice, Borrower must give Lender a new notice.

**Late Charge:** If a payment on this Note is more than **10** days late, Lender may charge Borrower a late fee of up to **5%** of the unpaid portion of the regularly scheduled payment.

**Subsidy Recoupment Fee:** For all loans with a maturity of 15 years or more, when in any one of the first three years following the date of first disbursement Borrower voluntarily prepays more than 25% of the outstanding principal balance of the loan, Borrower must pay to Lender on behalf of SBA a prepayment fee for that year as follows: during the first year, 5% of the total prepayment ; during the second year, 3% of the total prepayment; and, during the third year, 1% of the total prepayment.

F. **USE OF PROCEEDS**
Lender must document that borrower uses loan proceeds for the purposes stated in this Authorization as specified below. Lender must use the same closing and disbursement documentation and processes that it uses on its similarly-sized, non-SBA guaranteed commercial loans to verify the disbursement and is not required to use SBA Form 1050. Lenders must use commercially reasonable and prudent practices to verify that disbursement is in accordance with this Authorization.

1. $ _172976.17_ For working capital
2. $_____ For purchasing furniture, fixtures, or equipment
3. $_____ For purchasing inventory
4. $_____ For paying notes payable
5. $ _273.83_ Closing costs
6. $ _1750.00_ Packaging fee
7. $ _0.00_ Guarantee fee

DocuSign Envelope ID: 801AC279-A0B9-40C8-A197-4D96EFC9ABA7

This is a copy view of the Authoritative Copy held
by the designated custodian

G. **COLLATERAL CONDITIONS:**

Lender must obtain all required collateral and must meet all other required conditions before first disbursement.

Lender may use its own form of guarantee or the SBA form 148 and/or 148L. If the lender uses its own guaranty form, the guaranty must include the following language: *"When SBA is the holder, the Note and this Guarantee will be construed and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Guarantee, Guarantor may not claim or assert any local or state law against SBA to deny any obligation, defeat any claims of SBA, or preempt federal law."*

**Collateral:**

    UCC blanket lien on all business assets. Cadence Bank will be in a 3rd lien position.

With respect to collateral taken, lenders must use commercially reasonable and prudent practices to identify collateral items, which would include conformance with procedures at least as thorough as those used for their similarly-sized non-SBA guaranteed commercial loans.

Lenders may follow their internal collateral policy for similarly-sized non-SBA guaranteed commercial loans, including life insurance.

Lender must obtain a list of all equipment and fixtures that are collateral for the Loan. For items with a unit value of $5,000 or more, the list must include a description and serial number, if applicable.

Personal Guaranty, by ___Jonas Mitchell_____ , resident in ___TX_____ .

H. **ADDITIONAL CONDITIONS**

1. **Borrower, Guarantor and Operating Company Documents**
a. Prior to closing, Lender must obtain from Borrower, Guarantor and Operating Company a current (within 90 days) copy of each of the following as appropriate:

(1) **Corporate Documents including Certificate of Good Standing**
(2) **Limited Liability Company (LLC) Documents**
(3) **General Partnership Documents**
(4) **Limited Partnership Documents**
(5) **Limited Liability Partnership (LLP) Documents**
(6) **Trustee Certification**
(7) **Trade Name**

DocuSign Envelope ID: 801AC279-A0B9-40C8-A197-4D96EFC0A0A7

This is a copy view of the Authoritative Copy held
by the designated custodian

**2. Certifications and Agreements**

Prior to disbursement, Lender must require Borrower and Operating Company to certify the relevant conditions detailed in the Borrower's Certification Form attached as Appendix A.  Lender may use this sample form as the basis for obtaining all required certifications.

**3. Documentation Requirements/Additional Conditions:**

Prior to disbursement, Lender must:

Obtain required (maximum insurable value) hazard insurance on all assets taken as collateral, as set forth in SOP 50 10.

Make the required flood hazard determination and obtain required flood insurance pursuant to the flood insurance requirements in SOP 50 10.

Provide copies of UCC searches dated within 30 days of closing and evidence that the intended lien position was verified for all assets taken as collateral.

For loans over $250,000 when the loan is secured by commercial real estate, obtain an appraisal that meets the requirements of SOP 50 10.

When loan proceeds are to be used for the construction of a new building, or for an addition to a building, the construction must conform with the National Earthquake Hazards Reduction Program Recommended Provisions for the Development of Seismic Regulations of New Buildings (NEHRP) or a building code that SBA has identified as having substantially equivalent provisions.  This compliance may be evidenced by a certificate issued by a licensed building professional familiar with these standards or other evidence as set forth in SOP 50 10.

For any loan involving construction of more than $10,000, require borrower and contractor to execute SBA Form 601, Applicant's Agreement of Compliance.

Obtain SBA Form 159(7a) for any assistance paid for in connection with the loan application.

Require appropriate environmental reviews and compliance. Lenders must follow the environmental requirements in SOP 50 10.  Lenders may not request a loan number for a loan that will be secured by collateral that will not meet SBA's environmental requirements or that will require use of a non-standard indemnification agreement.

Lender to document any required Equity Injection.

Lease – Current lease(s) on all business premises where collateral is located with terms, including options, at least as long as the term of the Loan.

In accordance with SOP 50 10, Lender should obtain a written agreement from all Lessors (including sub-lessors) agreeing to: (1) Subordinate to Lender the Lessor's interest, if any, in this property; (2) Provide Lender written notice of default and reasonable opportunity to cure the default; and (3) Allow Lender the right to take possession and dispose of or remove the collateral.

In accordance with SOP 5010, verification of LPR or legal alien status must be received by the lender prior to submission of the request for Guaranty.

DocuSign Envelope ID: 801AC279-A0B9-40C8-A197-4D56EFC3ABA7

This is a copy view of the Authoritative Copy held
by the designated custodian

Other Special Conditions:

1. _____

2. _____


ADMINISTRATOR
SMALL BUSINESS ADMINISTRATION

By: **[Name, Title]**  Date                              **[Approval Date]**

Preferred Lender, as Lender and as an Agent of and on behalf of the SBA for the purpose of executing this Authorization.

LENDER

By _____              8/1/2022
(Authorized Signature)                            _____
                                                  (Date)

Sherry Martin, Vice President
(Name Print/Title)

COPY VIEW

DocuSign Envelope ID: 801AC279-A0B9-40C8-A197-4D56EFC5ABA7

This is a copy view of the Authoritative Copy held
by the designated custodian

APPENDIX A

# BORROWER'S CERTIFICATION

**INSTRUCTIONS: INDICATE THE PARAGRAPHS BEING CERTIFIED TO BY HAVING THE BORROWER INITIAL IN THE [ _____ ] NEXT TO THE APPROPRIATE PARAGRAPHS, PRIOR TO SIGNING.**

In order to induce _____ ("**Lender**") to make a U. S. Small Business Administration ("**SBA**") guaranteed Loan, SBA Loan Number 4212419100_____ ("**Loan**") to JD Mitchell Transport LLC_____ ("**Borrower**"),

A. Borrower and _____ [N/A]_____ ("**Operating Company**") certify that:

[ *J.M* ] 1. **Receipt of Authorization (MANDATORY)** - Borrower and Operating Company have received a copy of the Authorization for this Loan from Lender, and acknowledge that:

a. The Authorization is not a commitment by Lender to make a loan to Borrower;

b. The Authorization is between Lender and SBA and creates no third party rights or benefits to Borrower;

c. The Note will require Borrower to give Lender prior notice of intent to prepay.

d. If Borrower defaults on Loan, SBA may be required to pay Lender under the SBA guarantee. SBA may then seek recovery of these funds from Borrower. Under SBA regulations, 13 CFR Part 101, Borrower may not claim or assert against SBA any immunities or defenses available under local law to defeat, modify or otherwise limit Borrower's obligation to repay to SBA any funds advanced by Lender to Borrower.

e. Payments by SBA to Lender under SBA's guarantee will not apply to the Loan account of Borrower, or diminish the indebtedness of Borrower under the Note or the obligations of any personal guarantor of the Note.

[ *J.M* ] 2. **Adverse Change (MANDATORY)** - That there has been no adverse change in Borrower's (and Operating Company) financial condition, organization, operations or fixed assets since the date the Loan application was signed.

[ *J.M* ] 3. **Child Support (MANDATORY)** - No principal who owns at least 50% of the ownership or voting interest of the company is delinquent more than 60 days under the terms of any (1) administrative order, (2) court order, or (3) repayment agreement requiring payment of child support.

[ *J.M* ] 4. **Current Taxes (MANDATORY)**- Borrower and Operating Company are current (or will be current with any loan proceeds specified for eligible tax payments) on all federal, state, and local taxes, including but not limited to income taxes, payroll taxes, real estate taxes, and sales taxes.

[ *J.M* ] 5. **Environmental (MANDATORY)** — For any real estate pledged as collateral for the Loan or where the Borrower or Operating Company is conducting business operations (collectively "the Property"):

(a) At the time Borrower and Operating Company submitted the Loan application, Borrower was in compliance with all local, state, and federal environmental laws and regulations pertaining to reporting or clean-up of any hazardous substance, hazardous waste, petroleum product, or any other pollutant regulated by state or federal law as hazardous to the environment (Contaminant), and regarding any permits needed for the creation, storage, transportation or disposal of any Contaminant;

(b) Borrower and Operating Company will continue to comply with these laws and regulations;

(c) Borrower and Operating Company, and all of its principals, have no knowledge of the actual or potential existence of any Contaminant that exists on, at, or under the Property , including groundwater under such Property other than what was disclosed in connection with the Environmental Investigation of the Property;

(d) Until full repayment of Loan, Borrower and Operating Company will promptly notify Lender if it knows or suspects that there has been, or may have been, a release of a Contaminant, in, at or under the Property, including groundwater, or if Borrower or Operating Company or such property are subject to any investigation or enforcement action by any federal,

DocuSign Envelope ID: 8D7AC2F9-A0B8-40C8-A73C-4E596EFC645A

This is a copy view of the Authoritative Copy held
by the designated custodian

state or local environmental agency (Agency) pertaining to any Contaminant on, at, or under such Property, including groundwater.

(e) As to any Property owned by Borrower or Operating Company, Borrower or Operating Company indemnifies, and agrees to defend and hold harmless Lender and SBA, and any assigns or successors in interest which take title to the Property, from and against all liabilities, damages, fees, penalties or losses arising out of any demand, claim or suit by any Agency or any other party relating to any Contaminant found on, at or under the Property, including groundwater, regardless of whether such Contaminant resulted from Borrower's or Operating Company's operations. (Lender or SBA may require Borrower or Operating Company to execute a separate indemnification agreement).

[ \_\_\_\_\_ ] 6. **Credit Card Debt (Mandatory for Refinancing Credit Card Debt)** - The total of the payments by this loan on Borrower's credit card obligation(s) is not greater than the total of Borrower's specific business-related purchases charged to the credit card(s).

B. Borrower and Operating Company certify that they will:

[ \_\_\_\_\_ ] 1. **Reimbursable Expenses**- **(MANDATORY)** Reimburse Lender for expenses incurred in the making and administration of the Loan.

[ \_\_\_\_\_ ] 2. **Books, Records, and Reports (MANDATORY)**

a. Keep proper books of account in a manner satisfactory to Lender;

b. Furnish [check *one if appropriate*: ☐  compiled - ☐  reviewed - ☐   audited] year-end statements to Lender within _____ days *[120 days, if not filled in]* of fiscal year end;

c. Furnish additional financial statements or reports whenever Lender requests them;

d. Allow Lender or SBA, at Borrower's or Operating Company's expense, to:

   1) Inspect and audit books, records and papers relating to Borrower's and Operating Company's financial or business condition; and

   2) Inspect and appraise any of Borrower's and Operating Company's assets; and

   3) Allow all government authorities to furnish reports of examinations, or any records pertaining to Borrower and Operating Company, upon request by Lender or SBA.

[ \_\_\_\_\_ ] 3. **Equal Opportunity (MANDATORY)** - Post SBA Form 722, Equal Opportunity Poster, where it is clearly visible to employees, applicants for employment and the general public.

[ \_\_\_\_\_ ] 4. **American-made Products (MANDATORY) -** To the extent practicable, purchase only American-made equipment and products with the proceeds of the Loan.

[ \_\_\_\_\_ ] 5. **Taxes (MANDATORY)** - Pay all federal, state, and local taxes, including income, payroll, real estate and sales taxes of the business when they come due.

**Occupancy MANDATORY if building purchased, renovated, or constructed with loan proceeds:**

[ \_N/A\_\_\_\_\_ ] 6. **Occupancy** - Occupy at least 51% of the total Rentable Property and may lease up to 49% for business or residential use. Borrower will not use Loan proceeds to improve or renovate any of the Rentable Property leased to third parties. Borrower may provide up to 49% of the Rentable Property to be occupied by Borrower for use by a resident owner or manager only if the nature of the business demands it.

[ \_N/A\_\_\_\_\_ ] 7. **Occupancy** - Comply with the following provisions: (a) Borrower must lease 100% of the Rentable Property to Operating Company; (b) Operating Company may sublease up to 49% of the Rentable  Property for business or residential use; and (c) Operating Company will not use Loan proceeds to improve or renovate any of the Rentable Property that is to be sub-leased. Operating Company may provide up to 49% of the Rentable Property occupied by Operating Company for use by a resident owner or manager only if the nature of the business demands it.

[ \_N/A\_\_\_\_\_ ] 8. **Occupancy** - Occupy at least 60% of the Rentable Property; (b) Continue to occupy at least 60% of the Rentable Property for the term of the Loan; (c) Lease long term no more than 20% of the Rentable Property to one or more tenants for business or residential use; (d) Plan to occupy within three years some of the remaining Rentable Property not immediately occupied or leased long term; (e) Plan to occupy within ten years all of the Rentable Property not immediately occupied or leased long term; and (f) will not use Loan proceeds to improve the space not immediately occupied by Borrower to enhance the leasehold value to tenant beyond that necessary for the Borrower's intended use as a future occupant under (d) and (e) above, or to enhance the leasehold value to a tenant under (c) above. However, Borrower may provide up to 49% of the total Rentable Property occupied by Borrower for use by a resident owner or manager only if the nature of the business demands it.

DocuSign Envelope ID: 801AC279-A0B9-4DC8-A197-4D96EFC5ABA7

This is a copy view of the Authoritative Copy held
by the designated custodian

[ _N/A_____ ] 9. **Occupancy** - Comply with the following provisions: (a) Borrower must lease 100% of the Rentable Property to Operating Company; (b) Operating Company must immediately occupy at least 60% of the Rentable Property; (c) Operating Company must continue to occupy at least 60% of the Rentable Property for the term of the Loan; (d) Operating Company will lease long term no more than 20% of the Rentable Property to one or more tenants; (e) Operating Company must plan to occupy within three years some of the remaining Rentable Property not immediately occupied or leased long term; (f) Operating Company must plan to occupy within ten years all of the Rentable Property not immediately occupied or leased long term; and (g) Operating Company will not use Loan proceeds to improve the space not immediately occupied by Operating Company to enhance the leasehold value to tenant beyond that necessary for the Operating Company's intended use as future occupant under (e) and (f) above, or to enhance the leasehold value to a tenant under (d) above. However, Operating Company may provide up to 49% of the total Rentable Property occupied by Operating Company for use by a resident owner or manager only if the nature of the business demands it.

C. Borrower and Operating Company certify that they will not, without Lender's prior written consent:

[ _J.M._____ ] 1. **Distributions (MANDATORY)** - Make any distribution of company assets that will adversely affect the financial condition of Borrower and/or Operating Company.

[ _J.M._____ ] 2. **Ownership Changes (MANDATORY)** - Change the ownership structure or interests in the business during the term of the Loan.

[ _J.M._____ ] 3. **Transfer of Assets (MANDATORY)** - Sell, lease, pledge, encumber (except by purchase money liens on property acquired after the date of the Note), or otherwise dispose of any of Borrower's property or assets, except in the ordinary course of business.

[ _____ ] 4. **Fixed Asset Limitation (OPTIONAL)** - Acquire by purchase or lease agreement any fixed assets (totaling more than $_____ in any year).

[ _____ ] 5. **Location Limitation (OPTIONAL)** - Acquire by purchase or by lease, any additional locations.

[ _____ ] 6. **Limitation on Compensation (OPTIONAL)** - Allow total annual salaries, withdrawals or other forms of remuneration to officers or owners of Borrower and Operating Company, and their immediate family members, to exceed $_____.

[ _____ ] 7. _____
_____
_____
_____
_____
_____
_____
_____

(Borrower) DocuSigned by:

By: _Jonas Mitchell_____Date _____    9/28/2022  |  5:48 PM CDT
— 2355D59D616B4A3

(Operating Company) Date
By: _____[N/A]_____

# EXHIBIT B

DocuSign Envelope ID: 610 AC839-A084-40C8-A79C-1D96EFFCB69A
This is a copy view of the Authoritative Copy held by the designated custodian



U.S. Small Business Administration

# NOTE

| SBA Loan # | 4212419100 |
|---|---|
| SBA Loan Name | JD MITCHELL TRANSPORT LLC |
| Date | SEPTEMBER 28, 2022 |
| Loan Amount | $175,000.00 |
| Interest Rate | 8.25 % (initial rate, Wall Street Journal Prime + 2.75%) |
| Borrower | JD MITCHELL TRANSPORT LLC |
| Operating Company | |
| Lender | CADENCE BANK |

1. PROMISE TO PAY:

In return for the Loan, Borrower promises to pay to the order of Lender the amount of One Hundred Seventy Five Thousand Dollars and no/100ths _____ Dollars, interest on the unpaid principal balance, and all other amounts required by this Note.

2. DEFINITIONS:

"Collateral" means any property taken as security for payment of this Note or any guarantee of this Note.

"Guarantor" means each person or entity that signs a guarantee of payment of this Note.

"Loan" means the loan evidenced by this Note.

"Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral.

"SBA" means the Small Business Administration, an Agency of the United States of America.

DocuSign Envelope ID: 85D4A637-7A08-400C8-A19C-4B96EFC8485A

This is a copy view of the Authoritative Copy held
by the designated custodian

3.    PAYMENT TERMS:

Borrower must make all payments at the place Lender designates. The payment terms for this Note are:

This Note will mature in 10 years from date of Note. The interest rate on this Note will fluctuate. The initial interest rate is 8.25% per year. This initial rate is the Prime Rate in effect on the first business day of the month in which SBA received the loan application, plus 2.75%. The initial interest rate must remain in effect until the first change period begins unless reduced in accordance with SOP 50 10.

Borrower must pay principal and interest payments of $2,077.28 every month, beginning two months from the month this Note is dated; payments must be made on the second calendar day in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

The interest rate will be adjusted every calendar quarter (the "change period"). The first change period is October 1, 2022.

The "Prime Rate" is the Prime Rate in effect on the first business day of the month (as published in the Wall Street Journal newspaper) in which SBA received the application, or any interest rate change occurs. Base Rates will be rounded to two decimal places with .004 being rounded down and .005 being rounded up.

The adjusted interest rate will be 2.75% above the Prime Rate. Lender will adjust the interest rate on the first calendar day of each change period. The change in interest rate is effective on that day whether or not Lender gives Borrower notice of the change.

The spread as identified in the Note may not be changed during the life of the Loan without the written agreement of the Borrower.

For variable rate loans, the interest rate adjustment period may not be changed without the written consent of the Borrower.

Lender must adjust the payment amount at least annually as needed to amortize principal over the remaining term of the note.

If SBA purchases the guaranteed portion of the unpaid principal balance, the interest rate becomes fixed at the rate in effect at the time of the earliest uncured payment default. If there is no uncured payment default, the rate becomes fixed at the rate in effect at the time of purchase.

Loan Prepayment:
Notwithstanding any provision in this Note to the contrary:

Borrower may prepay this Note. Borrower may prepay 20 percent or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20 percent and the Loan has been sold on the secondary market, Borrower must:

a. Give Lender written notice;
b. Pay all accrued interest; and
c. If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.

If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.
All remaining principal and accrued interest is due and payable 10 years from date of Note.

Late Charge: If a payment on this Note is more than 10 days late, Lender may charge Borrower a late fee of up to 5.00% of the unpaid portion of the regularly scheduled payment

DocuSign Envelope ID: 80FA527F9ADBBA19C8-AF994D86EFC3FE97

This is a copy view of the Authoritative Copy held
by the designated custodian

4.   DEFAULT:

Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company:

A.   Fails to do anything required by this Note and other Loan Documents;

B.   Defaults on any other loan with Lender;

C.   Does not preserve, or account to Lender's satisfaction for, any of the Collateral or its proceeds;

D.   Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender or SBA;

E.   Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender or SBA;

F.   Defaults on any loan or agreement with another creditor, if Lender believes the default may materially affect Borrower's ability to pay this Note;

G.   Fails to pay any taxes when due;

H.   Becomes the subject of a proceeding under any bankruptcy or insolvency law;

I.   Has a receiver or liquidator appointed for any part of their business or property;

J.   Makes an assignment for the benefit of creditors;

K.   Has any adverse change in financial condition or business operation that Lender believes may materially affect Borrower's ability to pay this Note;

L.   Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without Lender's prior written consent; or

M.   Becomes the subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay this Note.

5.   LENDER'S RIGHTS IF THERE IS A DEFAULT:

Without notice or demand and without giving up any of its rights, Lender may:

A.   Require immediate payment of all amounts owing under this Note;

B.   Collect all amounts owing from any Borrower or Guarantor;

C.   File suit and obtain judgment;

D.   Take possession of any Collateral; or

E.   Sell, lease, or otherwise dispose of, any Collateral at public or private sale, with or without advertisement.

6.   LENDER'S GENERAL POWERS:

Without notice and without Borrower's consent, Lender may:

A.   Bid on or buy the Collateral at its sale or the sale of another lienholder, at any price it chooses;

B.   Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document, and preserve or dispose of the Collateral.  Among other things, the expenses may include payments for property taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs.  If Lender incurs such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance;

C.   Release anyone obligated to pay this Note;

D.   Compromise, release, renew, extend or substitute any of the Collateral; and

E.   Take any action necessary to protect the Collateral or collect amounts owing on this Note.

DocuSign Envelope ID: 80YAC279-A6B8-40C8-A197-4D86EFC9ADA7

This is a copy view of the Authoritative Copy held
by the designated custodian

7.   WHEN FEDERAL LAW APPLIES:

When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes.  By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability.  As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation,  defeat any claim of SBA, or preempt federal law.

8.   SUCCESSORS AND ASSIGNS:

Under this Note, Borrower and Operating Company include the successors of each, and Lender includes its successors and assigns.

9.   GENERAL PROVISIONS:

A.   All individuals and entities signing this Note are jointly and severally liable.

B.   Borrower waives all suretyship defenses.

C.   Borrower must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

D.   Lender may exercise any of its rights separately or together, as many times and in any order it chooses.  Lender may delay or forgo enforcing any of its rights without giving up any of them.

E.   Borrower may not use an oral statement of Lender or SBA to contradict or alter the written terms of this Note.

F.   If any part of this Note is unenforceable, all other parts remain in effect.

G.   To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor.  Borrower also waives any defenses based upon any claim that Lender did not obtain any guarantee; did not obtain, perfect, or maintain a lien upon Collateral; impaired Collateral; or did not obtain the fair market value of Collateral at a sale.

DocuSign Envelope ID: 30FA0279-A088-40C8-A19C-B96EFC849BA7

This is a copy view of the Authoritative Copy held
by the designated custodian

10.  STATE-SPECIFIC PROVISIONS:



DocuSign Envelope ID: 801A02F9-A0B9-46C8-A194-4D86EFC5AB87

THIS IS A COPY VIEW OF
This is a copy view of the Authoritative Copy held
by the designated custodian

11.   BORROWER'S NAME(S) AND SIGNATURE(S):

By signing below, each individual or entity becomes obligated under this Note as Borrower.



JD MITCHELL TRANSPORT LLC

Jonas Mitchell, Member

9/28/2022  |  5:48  PM  CDT

Date

# EXHIBIT C

DocuSign Envelope ID: 4ED4A039-A0BA-47C8-A2C4-1196EFC3034A

This is a copy view of the Authoritative Copy held by the designated custodian

≡ **CADENCE**
   B A N K

# COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $175,000.00 | 09-28-2022 | 09-28-2032 | 1230291179 | 4004 / AL | *** | EGON | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Grantor:**    JD MITCHELL TRANSPORT LLC
            2944 La Roda
            Grand Prairie, TX  75054

**Lender:**    CADENCE BANK
            SBA Middle Georgia
            Duluth Branch
            1970 Satellite Blvd
            Duluth, GA  30097

---

THIS COMMERCIAL SECURITY AGREEMENT dated September 28, 2022, is made and executed between JD MITCHELL TRANSPORT LLC ("Grantor") and CADENCE BANK ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

     **All Business Assets Including But Not Limited To All Inventory, Chattel Paper, Accounts, Equipment, Furniture and General Intangibles of The Business known as JD MITCHELL TRANSPORT LLC located at 2944 La Roda Grand Prairie, TX 75054 or located elsewhere**

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

     (A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

     (B) All products and produce of any of the property described in this Collateral section.

     (C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

     (D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

     (E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**FUTURE ADVANCES.** In addition to the Note, this Agreement secures all future advances made by Lender to Grantor regardless of whether the advances are made a) pursuant to a commitment or b) for the same purposes.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

     **Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. **This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.**

     **Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management or in the members or managers of the limited liability company Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

     **No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its membership agreement does not prohibit any term or condition of this Agreement.

     **Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

     **Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form

This is a copy view of the Authoritative Copy held
by the designated custodian

**COMMERCIAL SECURITY AGREEMENT**
**(Continued)**

satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sales of inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of Texas, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, Lender's reasonable attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall

DocuSign Envelope ID: 80VA02F94B8B4BC8-AF39-D86EFC5AEB47
This is a copy view of the Authoritative Copy held
by the designated custodian

**COMMERCIAL SECURITY AGREEMENT**
**(Continued)**

be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. To the extent permitted by applicable law, all such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon the occurrence of any Event of Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.** Any guarantor or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of any guarantor's or Grantor's property or ability to perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution of Grantor (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Grantor's existence as a going business or the death of any member, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

DocuSign Envelope ID: 8D7AC2F9-A6B5-40C8-A19F-0F356EFC34DA7

This is a copy view of the Authoritative Copy held
by the designated custodian

**COMMERCIAL SECURITY AGREEMENT**
**(Continued)**

---

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Texas Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter, provided Lender does so without a breach of the peace or a trespass, upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**APPLICABLE LAW. THE LOAN SECURED BY THIS LIEN WAS MADE UNDER A UNITED STATES SMALL BUSINESS ADMINISTRATION (SBA) NATIONWIDE PROGRAM WHICH USES TAX DOLLARS TO ASSIST SMALL BUSINESS OWNERS. IF THE UNITED STATES IS SEEKING TO ENFORCE THIS DOCUMENT, THEN UNDER SBA REGULATIONS: (A) WHEN SBA IS THE HOLDER OF THE NOTE, THIS DOCUMENT AND ALL DOCUMENTS EVIDENCING OR SECURING THIS LOAN WILL BE CONSTRUED IN ACCORDANCE WITH FEDERAL LAW; (B) LENDER OR SBA MAY USE LOCAL OR STATE PROCEDURES FOR PURPOSES SUCH AS FILING PAPERS, RECORDING DOCUMENTS, GIVING NOTICE, FORECLOSING LIENS, AND OTHER PURPOSES. BY USING THESE PROCEDURES, SBA DOES NOT WAIVE ANY FEDERAL IMMUNITY FROM LOCAL OR STATE CONTROL, PENALTY OR TAX LIABILITY. NO BORROWER OR GUARANTOR MAY CLAIM OR ASSERT AGAINST SBA ANY LOCAL OR STATE LAW TO DENY ANY OBLIGATION OF BORROWER OR DEFEAT ANY CLAIM OF SBA WITH RESPECT TO THIS LOAN. ANY CLAUSE IN THIS DOCUMENT REQUIRING ARBITRATION IS NOT ENFORCEABLE WHEN SBA IS THE HOLDER OF THE NOTE SECURED BY THIS DOCUMENT..**

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including Lender's reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** With respect to procedural matters related to the perfection and enforcement of Lender's rights against the Collateral, this Agreement will be governed by federal law applicable to Lender and to the extent not preempted by federal law, the laws of the State of

DocuSign Envelope ID: 6D7A0279-A0B6-40C8-A49F-D3336EFC86AA

This is a copy view of the Authoritative Copy held
by the designated custodian

**COMMERCIAL SECURITY AGREEMENT**
(Continued)

**Texas.** In all other respects, this Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Georgia without regard to its conflicts of law provisions. However, if there ever is a question about whether any provision of this Agreement is valid or enforceable, the provision that is questioned will be governed by whichever state or federal law would find the provision to be valid and enforceable. The loan transaction that is evidenced by the Note and this Agreement has been applied for, considered, approved and made, and all necessary loan documents have been accepted by Lender in the State of Georgia.

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Gwinnett County, State of Georgia.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means JD MITCHELL TRANSPORT LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means JD MITCHELL TRANSPORT LLC.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum

DocuSign Envelope ID: 80FA52F2-A3BB-418C8-AF59-9D66EFC5BEA7

This is a copy view of the Authoritative Copy held
by the designated custodian

**COMMERCIAL SECURITY AGREEMENT**
(Continued)

and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision of this Agreement together with all interest thereon.

**Lender.** The word "Lender" means CADENCE BANK, its successors and assigns.

**Note.** The word "Note" means the Note dated September 28, 2022 and executed by JD MITCHELL TRANSPORT LLC in the principal amount of $175,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED SEPTEMBER 28, 2022.

GRANTOR:

JD MITCHELL TRANSPORT LLC

By: _Jonas Mitchell_ _____
     Jonas Mitchell, Member of JD MITCHELL
     TRANSPORT LLC

LENDER:

CADENCE BANK

     ┌─ DocuSigned by:
X _Angela Eubanks_ _____
     Authorized Signer

LaserPro, Ver. 21.3.11.003 Copr. Finastra USA Corporation 1997, 2022. All Rights Reserved. - TX/GA C:\LASERPRO\CFI\LPL\E40.FC TR-59654 PR-230

# EXHIBIT D

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

Lien Solutions
Representation of filing

**This filing is Completed**
File Number : 0022004884266

File Date : 04-Oct-2022

A. NAME & PHONE OF CONTACT AT FILER (optional)
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

B. E-MAIL CONTACT AT FILER (optional)
uccfilingreturn@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)    24870 - CADENCE BANK

Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

89131521

TXTX

File with: Secretary of State, TX

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| JD MITCHELL TRANSPORT LLC | | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 2944 La Roda | Grand Prairie | TX | 75054 | | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Cadence Bank | | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 3500 Colonnade Parkway Suite 600 | Birmingham | GA | 35243 | | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All Business Assets Including But Not Limited To All Inventory, Chattel Paper, Accounts, Equipment, Furniture and General Intangibles of The Business known as JD MITCHELL TRANSPORT LLC located at 2944 La Roda Grand Prairie, TX 75054 or located elsewhere;

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
89131521          Cost Center #5410                    Loan #1230291179

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

DocuSign Envelope ID: 807AC273-AUB9-40C8-A19/-4D96EFC9A9A7

This is a copy view of the Authoritative Copy held
by the designated custodian

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional) | |
| Caroline Rubenstein 205-279-2203 | |
| B. E-MAIL CONTACT AT FILER (optional) | |
| caroline.rubenstein@cadencebank.com | |
| C. SEND ACKNOWLEDGMENT TO:   (Name and Address) | |

```
CADENCE BANK
LOAN OPERATIONS
3500 Colonnade Parkway, Ste 600
Birmingham, AL 35243
```

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| JD MITCHELL TRANSPORT LLC | | | |

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2944 La Roda | Grand Prairie | TX | 75054 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| CADENCE BANK | | | |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| Duluth Branch, 1970 Satellite Blvd | Duluth | GA | 30097 | USA |

4. COLLATERAL:  This financing statement covers the following collateral:

**All Business Assets Including But Not Limited To All Inventory, Chattel Paper, Accounts, Equipment, Furniture and General Intangibles of The Business known as JD MITCHELL TRANSPORT LLC located at 2944 La Roda Grand Prairie, TX 75054 or located elsewhere; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

| 6a. Check only if applicable and check only one box: | 6b. Check only if applicable and check only one box: |
|---|---|
| ☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien   ☐ Non-UCC Filing |

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
1230291179

SECURED PARTY COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Finastra
555 SW Morrison, Suite 300, Portland, OR
97204-1440

# EXHIBIT E

DocuSign Envelope ID: 80FAC279-A0B9-4DC8-A19F-4D56EFC2ABA7

This is a copy view of the Authoritative Copy held
by the designated custodian



U.S. Small Business Administration

# U.S. Small Business Administration

# UNCONDITIONAL GUARANTEE

| SBA Loan # | 4212419100 |
|---|---|
| SBA Loan Name | JD MITCHELL TRANSPORT LLC |
| Guarantor | JONAS MITCHELL |
| Borrower | JD MITCHELL TRANSPORT LLC |
| Lender | CADENCE BANK |
| Date | SEPTEMBER 28, 2022 |
| Note Amount | $175,000.00 |

1.   GUARANTEE:

Guarantor unconditionally guarantees payment to Lender of all amounts owing under the Note.  This Guarantee remains in effect until the Note is paid in full.  Guarantor must pay all amounts due under the Note when Lender makes written demand upon Guarantor.  Lender is not required to seek payment from any other source before demanding payment from Guarantor.

2.   NOTE:

The "Note" is the promissory note dated _____ September 28, 2022 _____ in the principal amount of _____ One Hundred Seventy Five Thousand Dollars and no/100ths _____ Dollars, from Borrower to Lender.  It includes any assumption, renewal, substitution, or replacement of the Note, and multiple notes under a line of credit.

3.   DEFINITIONS:

"Collateral" means any property taken as security for payment of the Note or any guarantee of the Note.

"Loan" means the loan evidenced by the Note.

"Loan Documents" means the documents related to the Loan signed by Borrower, Guarantor or any other guarantor, or anyone who pledges Collateral.

"SBA" means the Small Business Administration, an Agency of the United States of America.

COPY VIEW

DocuSign Envelope ID: 801AC275A0B3-40C8-A197-4D86EFC8ADA7

This is a copy view of the Authoritative Copy held
by the designated custodian

4.   LENDER'S GENERAL POWERS:

Lender may take any of the following actions at any time, without notice, without Guarantor's consent, and without making demand upon Guarantor:

A.   Modify the terms of the Note or any other Loan Document except to increase the amounts due under the Note;

B.   Refrain from taking any action on the Note, the Collateral, or any guarantee;

C.   Release any Borrower or any guarantor of the Note;

D.   Compromise or settle with the Borrower or any guarantor of the Note;

E.   Substitute or release any of the Collateral, whether or not Lender receives anything in return;

F.   Foreclose upon or otherwise obtain, and dispose of, any Collateral at public or private sale, with or without advertisement;

G.   Bid or buy at any sale of Collateral by Lender or any other lienholder, at any price Lender chooses; and

H.   Exercise any rights it has, including those in the Note and other Loan Documents.

These actions will not release or reduce the obligations of Guarantor or create any rights or claims against Lender.

5.   FEDERAL LAW:

When SBA is the holder, the Note and this Guarantee will be construed and enforced under federal law, including SBA regulations.  Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes.  By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability.  As to this Guarantee, Guarantor may not claim or assert any local or state law against SBA to deny any obligation, defeat any claim of SBA, or preempt federal law.

6.   RIGHTS, NOTICES, AND DEFENSES THAT GUARANTOR WAIVES:

To the extent permitted by law,

A.   Guarantor waives all rights to:
1)   Require presentment, protest, or demand upon Borrower;
2)   Redeem any Collateral before or after Lender disposes of it;
3)   Have any disposition of Collateral advertised; and
4)   Require a valuation of Collateral before or after Lender disposes of it.

B.   Guarantor waives any notice of:
1)   Any default under the Note;
2)   Presentment, dishonor, protest, or demand;
3)   Execution of the Note;
4)   Any action or inaction on the Note or Collateral, such as disbursements, payment, nonpayment, acceleration, intent to accelerate, assignment, collection activity, and incurring enforcement expenses;
5)   Any change in the financial condition or business operations of Borrower or any guarantor;
6)   Any changes in the terms of the Note or other Loan Documents, except increases in the amounts due under the Note; and
7)   The time or place of any sale or other disposition of Collateral.

C.   Guarantor waives defenses based upon any claim that:
1)   Lender failed to obtain any guarantee;
2)   Lender failed to obtain, perfect, or maintain a security interest in any property offered or taken as Collateral;
3)   Lender or others improperly valued or inspected the Collateral;
4)   The Collateral changed in value, or was neglected, lost, destroyed, or underinsured;

DocuSign Envelope ID: 80 7AC27-AUB840C8-A794-B96EFC8A68A7

This is a copy view of the Authoritative Copy held
by the designated custodian

COPY VIEW

5)   Lender impaired the Collateral;

6)   Lender did not dispose of any of the Collateral;

7)   Lender did not conduct a commercially reasonable sale;

8)   Lender did not obtain the fair market value of the Collateral;

9)   Lender did not make or perfect a claim upon the death or disability of Borrower or any guarantor of the Note;

10)  The financial condition of Borrower or any guarantor was overstated or has adversely changed;

11)  Lender made errors or omissions in Loan Documents or administration of the Loan;

12)  Lender did not seek payment from the Borrower, any other guarantors, or any Collateral before demanding payment from Guarantor:

13)  Lender impaired Guarantor's suretyship rights;

14)  Lender modified the Note terms, other than to increase amounts due under the Note.  If Lender modifies the Note to increase the amounts due under the Note without Guarantor's consent, Guarantor will not be liable for the increased amounts and related interest and expenses, but remains liable for all other amounts;

15)  Borrower has avoided liability on the Note;  or

16)  Lender has taken an action allowed under the Note, this Guarantee, or other Loan Documents.

7.   DUTIES AS TO COLLATERAL:

Guarantor will preserve the Collateral pledged by Guarantor to secure this Guarantee.  Lender has no duty to preserve or dispose of any Collateral.

8.   SUCCESSORS AND ASSIGNS:

Under this Guarantee, Guarantor includes heirs and successors, and Lender includes its successors and assigns.

9.   GENERAL PROVISIONS:

A.   ENFORCEMENT EXPENSES.  Guarantor promises to pay all expenses Lender incurs to enforce this Guarantee, including, but not limited to, attorney's fees and costs.

B.   SBA NOT A CO-GUARANTOR.  Guarantor's liability will continue even if SBA pays Lender.  SBA is not a co-guarantor with Guarantor.  Guarantor has no right of contribution from SBA.

C.   SUBROGATION RIGHTS.  Guarantor has no subrogation rights as to the Note or the Collateral until the Note is paid in full.

D.   JOINT AND SEVERAL LIABILITY.  All individuals and entities signing as Guarantor are jointly and severally liable.

E.   DOCUMENT SIGNING.  Guarantor must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

F.   FINANCIAL STATEMENTS.  Guarantor must give Lender financial statements as Lender requires.

G.   LENDER'S RIGHTS CUMULATIVE, NOT WAIVED.  Lender may exercise any of its rights separately or together, as many times as it chooses.  Lender may delay or forgo enforcing any of its rights without losing or impairing any of them.

H.   ORAL STATEMENTS NOT BINDING.  Guarantor may not use an oral statement to contradict or alter the written terms of the Note or this Guarantee, or to raise a defense to this Guarantee.

I.   SEVERABILITY.  If any part of this Guarantee is found to be unenforceable, all other parts will remain in effect.

J.   CONSIDERATION.  The consideration for this Guarantee is the Loan or any accommodation by Lender as to the Loan.

DocuSign Envelope ID: 80FA0279-A6B9-4DC8-A79F-4D96EFC6ABA7

This is a copy view of the Authoritative Copy held
by the designated custodian

10.   STATE-SPECIFIC PROVISIONS:



DocuSign Envelope ID: 601A629FAD8840C8-A1S4C1B96EFC8A6A7

This is a copy view of the Authoritative Copy held
by the designated custodian

11.   GUARANTOR ACKNOWLEDGMENT OF TERMS.

Guarantor acknowledges that Guarantor has read and understands the significance of all terms of the Note and this Guarantee, including all waivers.

12.   GUARANTOR NAME(S) AND SIGNATURE(S):

By signing below, each individual or entity becomes obligated as Guarantor under this Guarantee.



DocuSigned by:

*Jonas Mitchell*

2355D59D816B4A3...

Jonas Mitchell, Guarantor

9/28/2022 | 5:48 PM CDT

Date

# EXHIBIT F

DocuSign Envelope ID: 801AC275-A0B9-4CC8-A197-4D96EFC5ADA7

This is a copy view of the Authoritative Copy held
by the designated custodian

☰ **CADENCE**
B A N K

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $175,000.00 | 09-28-2022 | 09-28-2032 | 1230291179 | 4004 / AL | *** | EGON | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:**   JD MITCHELL TRANSPORT LLC
2944 La Roda
Grand Prairie, TX  75054

**Lender:**   CADENCE BANK
SBA Middle Georgia
Duluth Branch
1970 Satellite Blvd
Duluth, GA  30097

THIS BUSINESS LOAN AGREEMENT dated September 28, 2022, is made and executed between JD MITCHELL TRANSPORT LLC ("Borrower") and CADENCE BANK ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of September 28, 2022, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) Security Agreements granting to Lender security interests in the Collateral; (3) financing statements and all other documents perfecting Lender's Security Interests; (4) evidence of insurance as required below; (5) guaranties; (6) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

**Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.** Borrower is a limited liability company which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Texas. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign limited liability company in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 2944 La Roda, Grand Prairie, TX 75054. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: **None.**

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of organization or membership agreements, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to

DocuSign Envelope ID: 801AC279-A0B9-40C8-A197-4D86EFC5A5B47

This is a copy view of the Authoritative Copy held
by the designated custodian

**BUSINESS LOAN AGREEMENT**
**(Continued)**

all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties.  All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.**  Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral.  (2)  Borrower has no knowledge of, or reason to believe that there has been  (a)  any breach or violation of any Environmental Laws;  (b)  any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or  (c)  any actual or threatened litigation or claims of any kind by any person relating to such matters.  (3)  Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws.  Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement.  Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person.  The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances.  Borrower hereby  (1)  releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and  (2)  agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral.  The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.**  No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.**  To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.**  Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.**  This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.**  Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.**  Promptly inform Lender in writing of  (1)  all material adverse changes in Borrower's financial condition, and  (2)  all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.**  Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.**  Furnish Lender with such financial statements and other related information at such frequencies and in such detail as Lender may reasonably request.

**Additional Information.**  Furnish such additional information and statements, as Lender may request from time to time.

**Insurance.**  Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender.  Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender.  Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person.  In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.**  Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following:  (1)  the name of the insurer;  (2)  the risks insured;  (3)  the amount of the policy;  (4)  the properties insured;  (5)  the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and  (6)  the expiration date of the policy.  In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral.  The cost of such appraisal shall be paid by Borrower.

**Guaranties.**  Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantor named below, on Lender's forms, and in the amount and under the conditions set forth in those guaranties.

| Name of Guarantor | Amount |
|---|---|
| Jonas Mitchell | Unlimited |

**Other Agreements.**  Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.**  Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

This is a copy view of the Authoritative Copy held
by the designated custodian

**BUSINESS LOAN AGREEMENT**
(Continued)

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits.  Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as  (1)  the legality of the same shall be contested in good faith by appropriate proceedings, and  (2)  Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender.  Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.**  Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.**  Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.**  Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized.  Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.**  Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records.  If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Environmental Compliance and Reports.**  Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.**  Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**LENDER'S EXPENDITURES.**  If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral.  All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower.  All such expenses will become a part of the Indebtedness and, at Lender's option, will  (A)  be payable on demand;  (B)  be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either  (1)  the term of any applicable insurance policy; or  (2)  the remaining term of the Note; or  (C)  be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.**  Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Capital Expenditures.**  Make or contract to make capital expenditures, including leasehold improvements, in any fiscal year in excess of $_____ or incur liability for rentals of property (including both real and personal property) in an amount which, together with capital expenditures, shall in any fiscal year exceed such sum.

**Continuity of Operations.**  (1)  Engage in any business activities substantially different than those in which Borrower is presently engaged, (2)  cease operations, liquidate, merge or restructure as a legal entity (whether by division or otherwise), consolidate with or acquire any other entity, change its name, convert to another type of entity or redomesticate, dissolve or transfer or sell Collateral out of the ordinary course of business, or  (3)  make any distribution with respect to any capital account, whether by reduction of capital or otherwise.

**Agreements.**  Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.**  If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if:  (A)  Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender;  (B)  Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt;  (C)  there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or  (D)  any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or  (E)  Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**DEFAULT.**  Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.**  Borrower fails to make any payment when due under the Loan.

DocuSign Envelope ID: 780FA629-7A98-40C8-A19C-1B96EFC8A9A4

This is a copy view of the Authoritative Copy held
by the designated custodian

**Loan No: 1230291179**

# BUSINESS LOAN AGREEMENT
## (Continued)

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**APPLICABLE LAW. THE LOAN SECURED BY THIS LIEN WAS MADE UNDER A UNITED STATES SMALL BUSINESS ADMINISTRATION (SBA) NATIONWIDE PROGRAM WHICH USES TAX DOLLARS TO ASSIST SMALL BUSINESS OWNERS. IF THE UNITED STATES IS SEEKING TO ENFORCE THIS DOCUMENT, THEN UNDER SBA REGULATIONS: (A) WHEN SBA IS THE HOLDER OF THE NOTE, THIS DOCUMENT AND ALL DOCUMENTS EVIDENCING OR SECURING THIS LOAN WILL BE CONSTRUED IN ACCORDANCE WITH FEDERAL LAW; (B) LENDER OR SBA MAY USE LOCAL OR STATE PROCEDURES FOR PURPOSES SUCH AS FILING PAPERS, RECORDING DOCUMENTS, GIVING NOTICE, FORECLOSING LIENS, AND OTHER PURPOSES. BY USING THESE PROCEDURES, SBA DOES NOT WAIVE ANY FEDERAL IMMUNITY FROM LOCAL OR STATE CONTROL, PENALTY OR TAX LIABILITY. NO BORROWER OR GUARANTOR MAY CLAIM OR ASSERT AGAINST SBA ANY LOCAL OR STATE LAW TO DENY ANY OBLIGATION OF BORROWER OR DEFEAT ANY CLAIM OF SBA WITH RESPECT TO THIS LOAN. ANY CLAUSE IN THIS DOCUMENT REQUIRING ARBITRATION IS NOT ENFORCEABLE WHEN SBA IS THE HOLDER OF THE NOTE SECURED BY THIS DOCUMENT..**

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Subject to any limits under applicable law, costs and expenses include fifteen percent (15%) of the principal plus accrued interest collected as Lender's attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or

DocuSign Envelope ID: 8D4AC2F9-A0B9-40C8-A49F-4D96EFC3A5A7

Case 24-04030-mxm   Doc 1   Filed 04/29/24   Entered 04/29/24 15:42:12   Desc Main
Document      Page 52 of 64

This is a copy view of the Authoritative Copy held
by the designated custodian

**BUSINESS LOAN AGREEMENT**
**(Continued)**

Loan No: 1230291179                                                           Page 5

defenses that Borrower may have against Lender.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Georgia without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Georgia.

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Gwinnett County, State of Georgia.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in making the Loan, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the making of the Loan and delivery to Lender of the Related Documents, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means JD MITCHELL TRANSPORT LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

DocuSign Envelope ID: 8D1ROZF9-AUB9-40C8-A1SH4B96EPC9A9A7

This is a copy view of the Authoritative Copy held
by the designated custodian

| Loan No: 1230291179 | **BUSINESS LOAN AGREEMENT**<br>(Continued) | Page 6 |
|---|---|---|

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means CADENCE BANK, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note dated September 28, 2022 and executed by JD MITCHELL TRANSPORT LLC in the principal amount of $175,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED SEPTEMBER 28, 2022.

THIS AGREEMENT IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS AGREEMENT IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

**BORROWER:**

**JD MITCHELL TRANSPORT LLC**

By: _Jonas Mitchell_ _____ (Seal)
Jonas Mitchell, Member of JD MITCHELL
TRANSPORT LLC

**LENDER:**

**CADENCE BANK**

By: _Angela Eubanks_ _____ (Seal)
7C731AA31BA2411...
Authorized Signer

# EXHIBIT G

# GOLDER LAW, LLC

### ATTORNEYS AT LAW

101 Village Parkway
Building 1, Suite 400
Marietta, Georgia 30067

MARK L. GOLDER
E-MAIL: mgolder@golderlawfirm.com

TELEPHONE: (404) 252-3000
DIRECT LINE: (678) 553-3123

October 6, 2023

VIA CERTIFIED MAIL, RETURN
RECEIPT REQUESTED, AND REGULAR MAIL

JD Mitchell Transport LLC
Attention: Jonas Mitchell
Jonas Mitchell, Individually
2944 La Roda
Grand Prairie, Texas 75054

Re:   U.S. Small Business Administration Note Dated September 28, 2022 in
the Original Principal Amount of $175,000.00 Executed by JD Mitchell
Transport LLC; (the "Note"); Unconditional Guarantee Dated
September 28, 2022 Executed by Jonas Mitchell; Commercial Security
Agreement Dated September 28, 2022 Executed by JD Mitchell
Transport LLC.; All UCC Filings; All Loan and Collateral Documents (the
"Loan Documents")

To the Above-Named Addressees:

This law firm represents Cadence Bank, the holder of the above-referenced Loan
Documents. This letter is to notify you that the aforementioned Note is in default and demand
is made upon you for payment of the indebtedness. Because of the default, we have
accelerated the outstanding indebtedness due to my client. At this time, demand is made
upon you for payment of the principal amount of $167,892.80, plus accrued interest in the
amount of $6,228.36 as of October 4, 2023, with a per diem in the amount of $52.47 from
October 5, 2023, plus late fees in the amount of $361.14.

The aforementioned Note contains an attorneys' fees provision which my client
intends to enforce. Pursuant to Georgia law, specifically O.C.G.A. § 13-1-11, you are hereby
notified that you have ten days from your receipt of this letter to pay my client the
outstanding principal and interest owed. If you fail to pay my client the outstanding principal
and interest owed within ten days from your receipt of this letter, my client will be entitled
to recover statutory attorneys' fees, in addition to the principal and interest.

October 6, 2023
Page Two


My client is a secured creditor and reserves all of its rights pursuant to all documents executed by you as well as applicable law.

If you tender any funds to my client, they will be accepted only to reduce the outstanding indebtedness. This indebtedness will not be reinstated without the written consent of my client. My client has retained this firm to represent them in this matter. All correspondence and communications should be with the undersigned.

Sincerely,

Mark L. Golder

MLG:mec

cc:     Christian Wilson
        Elaine Gonzales
        Paulette Hunt

# EXHIBIT H

**NAVY FEDERAL**
**Credit Union**
PO Box 3000 • Merrifield, VA • 22119-3000
navyfederal.org

**Statement of Account**

Statement Period
09/01/22 - 09/30/22

Access No. 15023979

Routing Number: 2560-7497-4

#BWNLLSV
#000000Q5P2SYW9A0#000SME00F
JD MITCHELL TRANSPORT LLC
2944 LA RODA
GRAND PRAIRIE TX 75054-6510

Questions about this Statement?
Toll-free in the U.S. 1-888-842-6328
For toll-free numbers when overseas,
visit navyfederal.org/overseas/
Collect internationally 1-703-255-8837

**Say "Yes" to Paperless!** View your
digital statements via Mobile or
Navy Federal Online Banking.

**Say "Yes" to Paperless Statements**
If you haven't already, go paperless! You can access up to 36 months of statements anytime, anywhere.
To get started, select "Statements" in digital banking.*
It's an easy way to reduce the risk of identity theft and cut down on paper clutter.
Insured by NCUA. *Message and data rates may apply. Visit navyfederal.org for more information.

## Summary of your deposit accounts

| | Previous Balance | Deposits/ Credits | Withdrawals/ Debits | Ending Balance | YTD Dividends |
|---|---|---|---|---|---|
| Business Checking 7112337410 | $3,597.80 | $197,546.43 | $132,357.01 | $68,787.22 | $0.37 |
| Business Savings 3136408162 | $31.66 | $0.01 | $0.00 | $31.67 | $0.09 |
| Totals | $3,629.46 | $197,546.44 | $132,357.01 | $68,818.89 | $0.46 |

## Checking

**Business Checking - 7112337410**

| Date | Transaction Detail | Amount($) | Balance($) |
|---|---|---|---|
| 09-01 | Beginning Balance | | 3,597.80 |

REMITTANCE RECEIVED AFTER STATEMENT PERIOD WILL APPEAR ON YOUR NEXT STATEMENT

JD MITCHELL TRANSPORT LLC

15023979

**DEPOSIT VOUCHER**
(FOR MAIL USE ONLY. DO NOT SEND CASH THROUGH THE MAIL
DEPOSITS MAY NOT BE AVAILABLE FOR IMMEDIATE WITHDRAWAL)

MARK "X" TO CHANGE
ADDRESS/ORDER
ITEMS ON REVERSE

| ACCOUNT NUMBER | ACCOUNT TYPE | AMOUNT ENCLOSED |
|---|---|---|
| 7112337410 | Checking | |
| 3136408162 | Savings | |
| | | |
| | | |
| | TOTAL | |

NFCU
PO BOX 3100
MERRIFIELD VA 22119-3100

4057112337410313640816200000000000000000000000000000007

Page 2 of 7



**Navy Federal Credit Union**
PO Box 3000 • Merrifield, VA • 22119-3000
navyfederal.org

Statement Period
09/01/22 - 09/30/22

Access No. 15023979

**Statement of Account**
For JD MITCHELL TRANSPORT LLC

**Business Checking - 7112337410**

(Continued from previous page)

| Date | Transaction Detail | Amount($) | Balance($) |
|------|-------------------|-----------|-----------|
| 09-01 | Deposit - ACH Paid From Electronic Funds Smartpay 01Afd1 | 1,000.00 | 4,597.80 |
| 09-01 | ACH Paid To Jonas Mitchell | 400.00- | 4,197.80 |
| 09-01 | ACH Paid To Valencia Mitchel | 400.00- | 3,797.80 |
| 09-01 | POS Debit- Business Debit Card 1498 08-31-22 Waffle House 0739 Hammond LA | 16.50- | 3,781.30 |
| 09-01 | POS Debit- Business Debit Card 1571 09-01-22 Vsp 800-785-0699 800-785-0699 TX | 79.19- | 3,702.11 |
| 09-01 | POS Debit- Business Debit Card 1498 08-31-22 Dat Solutions 800-800-3285302 OR | 159.90- | 3,542.21 |
| 09-01 | Transfer To Checking Valencia Mitchell | 175.00- | 3,367.21 |
| 09-01 | Transfer To Checking Jonas Mitchell | 175.00- | 3,192.21 |
| 09-01 | Transfer To Checking Valencia Mitchell | 630.00- | 2,562.21 |
| 09-02 | Deposit - ACH Paid From Electronic Funds Smartpay 01Afd1 | 2,000.00 | 4,562.21 |
| 09-02 | POS Debit- Business Debit Card 1571 09-01-22 Uber Help.Uber.Com CA | 3.00- | 4,559.21 |
| 09-02 | POS Debit- Business Debit Card 1571 09-01-22 Uber Help.Uber.Com CA | 7.59- | 4,551.62 |
| 09-02 | POS Debit- Business Debit Card 1571 09-01-22 Raising Cane's 462 Terrell TX | 9.95- | 4,541.67 |
| 09-02 | POS Debit- Business Debit Card 1498 Transaction 09-01-22 Ta Slidell Slidell LA | 42.62- | 4,499.05 |
| 09-02 | POS Debit- Business Debit Card 1571 09-01-22 Txrp Fleetplus Re Egov.Com TX | 78.73- | 4,420.32 |
| 09-02 | POS Debit- Business Debit Card 1498 09-01-22 Capstone Pay Peachtree COR GA | 185.00- | 4,235.32 |
| 09-02 | POS Debit- Business Debit Card 1571 Transaction 09-01-22 Speedco #923 Hammond LA | 564.70- | 3,670.62 |
| 09-02 | Transfer To Checking Valencia Mitchell | 50.00- | 3,620.62 |
| 09-02 | Paid To - Bmo Harris Bank Bmoachpmt Chk 7100028 | 751.61- | 2,869.01 |
| 09-02 | Paid To - Bmo Harris Bank Bmoachpmt Chk 7100028 | 793.86- | 2,075.15 |
| 09-02 | Paid To - Lease Direct Web Pay Chk 4300009 | 1,222.19- | 852.96 |
| 09-06 | POS Debit- Business Debit Card 1571 09-02-22 McDonald's F36482 Gulfport MS | 2.13- | 850.83 |
| 09-06 | POS Debit- Business Debit Card 1571 09-02-22 Uber Help.Uber.Com CA | 3.00- | 847.83 |




**CHANGE OF ADDRESS**
PLEASE PRINT. USE BLUE OR BLACK BALL POINT PEN.

| RANK/RATE | NAME (FIRST | MI | LAST) | ACCOUNT NUMBERS AFFECTED |
|-----------|-------------|-----|-------|--------------------------|
| ADDRESS (NO. STREET) | | | | |

| CITY | STATE | ZIP CODE |
|------|-------|----------|
| SIGNATURE OF NAVY FEDERAL MEMBER | | |

| EFFECTIVE DATE (MO., DAY, YR.) | HOME TELEPHONE NUMBER | DAYTIME TELEPHONE NUMBER |
|-------------------------------|----------------------|--------------------------|



**Credit Union**
PO Box 3000 • Merrifield, VA • 22119-3000
navyfederal.org

Statement Period
09/01/22 - 09/30/22

Access No. 15023979

**Statement of Account**
For JD MITCHELL TRANSPORT LLC

## Business Checking - 7112337410

(Continued from previous page)

| Date | Transaction Detail | Amount($) | Balance($) |
|---|---|---|---|
| 09-06 | POS Debit- Business Debit Card 1498 09-02-22 Love's #595 Gulfport MS | 7.48- | 840.35 |
| 09-06 | POS Debit - Business Debit Card 1571 Transaction 09-02-22 Dodge City Petr Hanceville AL | 7.50- | 832.85 |
| 09-06 | POS Debit- Business Debit Card 1571 09-02-22 Uber Help.Uber.Com CA | 7.96- | 824.89 |
| 09-06 | POS Debit- Business Debit Card 1571 09-02-22 Daiquiris & Creams Slidell LA | 8.25- | 816.64 |
| 09-06 | POS Debit - Business Debit Card 1571 Transaction 09-02-22 Love's #595 Gulfport MS | 8.32- | 808.32 |
| 09-06 | POS Debit- Business Debit Card 1498 09-02-22 Daiquiris & Creams Slidell LA | 12.25- | 796.07 |
| 09-06 | POS Debit- Business Debit Card 1498 09-01-22 B J Seafood Hammond LA | 36.43- | 759.64 |
| 09-06 | POS Debit- Business Debit Card 1498 09-01-22 Outback 1912 Slidell LA | 50.52- | 709.12 |
| 09-06 | POS Debit- Business Debit Card 1498 09-02-22 Wyndham Wingate Sl Slidell LA | 145.50- | 563.62 |
| 09-06 | POS Debit- Business Debit Card 1571 09-02-22 Uplif, Inc. Httpswww.Upli CA | 268.14- | 295.48 |
| 09-06 | POS Debit- Business Debit Card 1571 09-02-22 Bose Corporation 800-3792073 MA | 356.14- | 60.66- |
| 09-07 | Deposit - ACH Paid From Electronic Funds Smartpay 01Afd1 | 3,000.00 | 2,939.34 |
| 09-08 | Deposit - ACH Paid From Electronic Funds Smartpay 01Afd1 | 4,000.00 | 6,939.34 |
| 09-08 | ACH Paid To Jonas Mitchell | 400.00- | 6,539.34 |
| 09-08 | ACH Paid To Valencia Mitchel | 400.00- | 6,139.34 |
| 09-08 | POS Debit- Business Debit Card 1571 09-07-22 Municipal Online P 844-7244507 TX | 2.50- | 6,136.84 |
| 09-08 | POS Debit - Business Debit Card 1498 09-07-22 Sxm*siriusxm.Com/A 888-635-5144 Ny | 73.72- | 6,063.12 |
| 09-08 | POS Debit - Business Debit Card 1498 Transaction 09-07-22 Elite Spa & Nails Grand Prairie TX | 125.00- | 5,938.12 |
| 09-08 | POS Debit - Business Debit Card 1498 09-07-22 Relay Payments Www.Relaypaym GA | 272.95- | 5,665.17 |
| 09-08 | POS Debit- Business Debit Card 1498 09-07-22 Hagerty 800-922-4050 MI | 392.00- | 5,273.17 |
| 09-08 | Transfer To Checking Valencia Mitchell | 85.00- | 5,188.17 |
| 09-08 | Transfer To Checking Valencia Mitchell | 175.00- | 5,013.17 |
| 09-08 | Transfer To Checking Valencia Mitchell | 175.00- | 4,838.17 |
| 09-08 | Transfer To Checking Jonas Mitchell | 630.00- | 4,208.17 |
| 09-09 | Deposit - ACH Paid From Electronic Funds Smartpay 01Afd1 | 2,500.00 | 6,708.17 |
| 09-09 | POS Debit - Business Debit Card 1571 Transaction 09-08-22 Kroger #0594 3300 E Br Mansfield TX | 9.58- | 6,698.59 |
| 09-09 | POS Debit- Business Debit Card 1571 09-08-22 Panda Express 1374 Dallas TX | 11.91- | 6,686.68 |
| 09-09 | POS Debit - Business Debit Card 1498 Transaction 09-08-22 Ta #237 Greenwo Greenwood LA | 17.99- | 6,668.69 |
| 09-09 | POS Debit- Business Debit Card 1498 09-08-22 Dry Clean Super Ce Grand Prairie TX | 25.35- | 6,643.34 |
| 09-09 | POS Debit - Business Debit Card 1498 Transaction 09-08-22 Shell Service Station Mansfield TX | 31.31- | 6,612.03 |
| 09-09 | POS Debit- Business Debit Card 1498 09-08-22 Dry Clean Super Ce Grand Prairie TX | 39.17- | 6,572.86 |
| 09-09 | POS Debit- Business Debit Card 1498 09-07-22 Shell Oil 41634220 Arlington TX | 59.64- | 6,513.22 |
| 09-09 | POS Debit- Business Debit Card 1571 09-07-22 Mansfield-Municipa 817-276-4200 TX | 192.00- | 6,321.22 |
| 09-09 | POS Debit- Business Debit Card 1571 09-08-22 Capitalontap New York Ny | 2,500.00- | 3,821.22 |
| 09-12 | Deposit - ACH Paid From Electronic Funds Smartpay 01Afd1 | 4,500.00 | 8,321.22 |



Page 4 of 7

**Credit Union**
PO Box 3000 • Merrifield, VA • 22119-3000
navyfederal.org

Statement Period
09/01/22 - 09/30/22

Access No. 15023979

Statement of Account
For JD MITCHELL TRANSPORT LLC

## Business Checking - 7112337410

(Continued from previous page)

| Date | Transaction Detail | Amount($) | Balance($) |
|------|-------------------|-----------|------------|
| 09-12 | ATM Fee - Withdrawal 09-09-22 Citgo 49 Gpt Gulfport MS | 1.00- | 8,320.22 |
| 09-12 | ATM Withdrawal 09-09-22 Citgo 49 Gpt Gulfport MS | 63.50- | 8,256.72 |
| 09-12 | POS Debit- Business Debit Card 1498 09-10-22 Love's #346 Columbia TN | 2.18- | 8,254.54 |
| 09-12 | POS Debit- Business Debit Card 1571 09-10-22 Arby's 346 Columbia TN | 3.00- | 8,251.54 |
| 09-12 | POS Debit- Business Debit Card 1498 09-09-22 Tst* Jamba Juice - Grand Prairie TX | 15.25- | 8,236.29 |
| 09-12 | POS Debit - Business Debit Card 1498 Transaction 09-09-22 Wal-Mart Super Center Gulfport MS | 35.67- | 8,200.62 |
| 09-12 | POS Debit - Business Debit Card 1571 09-09-22 Rocketlaw 877-757- Www.Rocketlaw CA | 39.99- | 8,160.63 |
| 09-12 | POS Debit - Business Debit Card 1498 Transaction 09-10-22 Cracker Barrel # 1410 Auburn IN | 45.86- | 8,114.77 |
| 09-12 | POS Debit- Business Debit Card 1498 09-09-22 Travelcenters #180 Slidell LA | 134.80- | 7,979.97 |
| 09-12 | POS Debit- Business Debit Card 1498 09-11-22 Pappadeaux Seafood Westmont IL | 304.14- | 7,675.83 |
| 09-12 | Transfer To Credit Card Jd Mitchell Transport LLC | 80.00- | 7,595.83 |
| 09-12 | Paid To - Barclaycard US Creditcard Chk 2600257 | 850.00- | 6,745.83 |
| 09-13 | Transfer From Checking Valencia Mitchell | 1,332.60 | 8,078.43 |
| 09-13 | Fed Express Fee | 11.50- | 8,066.93 |
| 09-13 | POS Debit- Business Debit Card 1571 09-12-22 Bcbs Health Ins PA 312-653-6000 IL | 1,332.60- | 6,734.33 |
| 09-15 | ACH Paid To Jonas Mitchell | 400.00- | 6,334.33 |
| 09-15 | ACH Paid To Valencia Mitchel | 400.00- | 5,934.33 |
| 09-15 | POS Debit- Business Debit Card 1571 09-14-22 The Ups Store 6870 682-4008556 TX | 48.00- | 5,886.33 |
| 09-15 | POS Debit- Business Debit Card 1571 09-13-22 Outback 4471 Texarkana TX | 73.17- | 5,813.16 |
| 09-15 | POS Debit- Business Debit Card 1571 09-15-22 Vsp 800-785-0699 800-785-0699 TX | 79.19- | 5,733.97 |
| 09-15 | Transfer To Checking Valencia Mitchell | 175.00- | 5,558.97 |
| 09-15 | Transfer To Checking Jonas Mitchell | 175.00- | 5,383.97 |
| 09-15 | Transfer To Checking Valencia Mitchell | 630.00- | 4,753.97 |
| 09-15 | Paid To - Oosi-DR Insurance Chk 10100001 | 284.17- | 4,469.80 |
| 09-16 | Deposit - ACH Paid From Electronic Funds Smartpay 01Ald1 | 4,000.00 | 8,469.80 |
| 09-16 | Transfer From Checking Valencia Mitchell | 35.00 | 8,504.80 |
| 09-16 | POS Debit- Business Debit Card 1571 09-14-22 Arby's 216 Midlothian TX | 11.57- | 8,493.23 |
| 09-16 | POS Debit- Business Debit Card 2355 09-15-22 Saltgrass Arlingto Arlington TX | 26.49- | 8,466.74 |
| 09-16 | POS Debit- Business Debit Card 1571 09-15-22 CPA Texas Tax Egov.Com TX | 51.00- | 8,415.74 |
| 09-16 | POS Debit- Business Debit Card 1571 09-15-22 Lets Get Poppin 773-7796132 IL | 56.95- | 8,358.79 |
| 09-19 | POS Debit- Business Debit Card 2355 09-17-22 Tst* Jamba Juice - Grand Prairie TX | 8.87- | 8,349.92 |
| 09-19 | POS Debit- Business Debit Card 2355 09-18-22 Tst* Jamba Juice - Grand Prairie TX | 15.25- | 8,334.67 |
| 09-19 | POS Debit- Business Debit Card 2355 09-15-22 Five Guys 1286 Qsr Arlington TX | 18.81- | 8,315.86 |
| 09-19 | POS Debit - Business Debit Card 2355 Transaction 09-16-22 Kroger #0 3300 E Broad Mansfield TX | 21.96- | 8,293.90 |
| 09-19 | POS Debit- Business Debit Card 2355 09-17-22 Dry Clean Super Ce Grand Prairie TX | 28.48- | 8,265.42 |
| 09-19 | POS Debit- Business Debit Card 2355 09-17-22 Clean Getaway Car Mansfield TX | 30.00- | 8,235.42 |
| 09-19 | POS Debit- Business Debit Card 2355 09-16-22 Looks Beauty Suppl Grand Prairie TX | 48.55- | 8,186.87 |
| 09-19 | Paid To - Venmo Payment Chk 9100001 | 35.00- | 8,151.87 |

Page 5 of 7



**Credit Union**
PO Box 3000 • Merrifield, VA • 22119-3000
navyfederal.org

Statement Period
09/01/22 - 09/30/22

Access No. 15023979

Statement of Account
For JD MITCHELL TRANSPORT LLC

## Business Checking - 7112337410

(Continued from previous page)

| Date | Transaction Detail | Amount($) | Balance($) |
|------|-------------------|-----------|-----------|
| 09-20 | POS Debit- Business Debit Card 1571 09-19-22 Ntta Autocharge 972-818-6882 TX | 80.00- | 8,071.87 |
| 09-22 | ACH Paid To Jonas Mitchell | 400.00- | 7,671.87 |
| 09-22 | ACH Paid To Valencia Mitchel | 400.00- | 7,271.87 |
| 09-22 | Transfer To Checking Valencia Mitchell | 175.00- | 7,096.87 |
| 09-22 | Transfer To Checking Jonas Mitchell | 175.00- | 6,921.87 |
| 09-22 | Transfer To Checking Valencia Mitchell | 630.00- | 6,291.87 |
| 09-23 | Deposit - ACH Paid From Electronic Funds Smartpay 01Afd1 | 1,000.00 | 7,291.87 |
| 09-26 | POS Debit- Business Debit Card 1571 09-24-22 Ntta Airport Parki 972-818-6882 TX | 75.00- | 7,216.87 |
| 09-26 | Transfer To Checking Valencia Mitchell | 110.00- | 7,106.87 |
| 09-26 | Paid To - Hnb Hnb 8042 Chk 4400002 | 3,180.46- | 3,926.41 |
| 09-27 | Deposit 09-26-22 Fchr Arlington, TX ATM2 | 42.56 | 3,968.97 |
| 09-27 | POS Debit- Business Debit Card 2355 09-26-22 Mohave Insurance Httpswww.Moha AZ | 3,198.91- | 770.06 |
| 09-28 | POS Debit- Business Debit Card 1571 09-28-22 Uber Help.Uber.Com CA | 2.00- | 768.06 |
| 09-28 | POS Debit- Business Debit Card 1571 09-28-22 Uber Help.Uber.Com CA | 9.92- | 758.14 |
| 09-28 | POS Debit - Business Debit Card 1571 Transaction 09-27-22 The Home Depot 8517 Grand Prairie TX | 44.79- | 713.35 |
| 09-29 | Deposit - ACH Paid From Electronic Funds Smartpay 01Afd1 | 1,000.00 | 1,713.35 |
| 09-29 | Bank Wire Deposit *Deposit* | 172,976.17 | 174,689.52 |
| 09-29 | ACH Paid To Jonas Mitchell | 400.00- | 174,289.52 |
| 09-29 | ACH Paid To Valencia Mitchel | 400.00- | 173,889.52 |
| 09-29 | ACH Paid To Ally | 910.63- | 172,978.89 |
| 09-29 | POS Debit- Business Debit Card 1571 09-29-22 Uber* Trip Www.Uber.Com CA | 2.01- | 172,976.88 |
| 09-29 | POS Debit- Business Debit Card 1571 09-29-22 Uber Help.Uber.Com CA | 2.06- | 172,974.82 |
| 09-29 | POS Debit- Business Debit Card 1571 09-29-22 Uber Help.Uber.Com CA | 9.94- | 172,964.88 |
| 09-29 | POS Debit- Business Debit Card 1571 09-29-22 Uber* Trip Www.Uber.Com CA | 9.99- | 172,954.89 |
| 09-29 | POS Debit- Business Debit Card 1571 09-28-22 B & J Seafood Hammond LA | 17.13- | 172,937.76 |
| 09-29 | POS Debit - Business Debit Card 1571 Transaction 09-28-22 Wal-Mart #0489 Hammond LA | 55.49- | 172,882.27 |
| 09-29 | Transfer To Checking Valencia Mitchell | 175.00- | 172,707.27 |
| 09-29 | Transfer To Credit Card Jd Mitchell Transport LLC *Bus. C.C Paymt* | 7,681.90- | 165,025.37 |
| 09-30 | Transfer From Checking Valencia Mitchell | 160.00 | 165,185.37 |
| 09-30 | Withdrawal By Check *Paid to J Mitchell* | 30,600.00- | 134,585.37 |
| 09-30 | Withdrawal By Check *Paid to V. Mitchell* | 62,500.00- | 72,085.37 |
| 09-30 | POS Debit- Business Debit Card 2355 09-28-22 Tst* The Chimes Ea Baton Rouge LA | 114.30- | 71,971.07 |
| 09-30 | POS Debit- Business Debit Card 2355 09-29-22 Inmate Payment 877-6504249 TX | 202.95- | 71,768.12 |
| 09-30 | POS Debit - Business Debit Card 2355 Transaction 09-30-22 Wal-Mart #0935 Denham Spring LA | 2,016.00- | 69,752.12 |
| 09-30 | Transfer To Checking Valencia Mitchell | 160.00- | 69,592.12 |
| 09-30 | Transfer To Checking Valencia Mitchell | 175.00- | 69,417.12 |
| 09-30 | Transfer To Checking Jonas Mitchell | 630.00- | 68,787.12 |
| 09-30 | Transfer To Checking | | |

Page 6 of ?

**NAVY ⊕ FEDERAL**
**Credit Union**
PO Box 3000 • Merrifield, VA • 22119-3000
navyfederal.org

Statement Period
09/01/22 - 09/30/22

Access No. 15023979

**Statement of Account**
For JD MITCHELL TRANSPORT LLC

## Business Checking - 7112337410

(Continued from previous page)

| Date | Transaction Detail | Amount($) | Balance($) |
|------|-------------------|-----------|-----------|
|  | Valencia Mitchell |  |  |
| 09-30 | Dividend | 0.10 | 68,787.22 |
| 09-30 | Ending Balance |  | **68,787.22** |

*Average Daily Balance - Current Cycle: $12,199.02*

### Items Paid

| Date | Item | Amount($) | Date | Item | Amount($) |
|------|------|-----------|------|------|-----------|
| 09-02 | ACH | 751.61 | 09-09 | POS | 17.99 |
| 09-02 | ACH | 793.86 | 09-09 | POS | 25.35 |
| 09-02 | ACH | 1,222.19 | 09-09 | POS | 31.31 |
| 09-12 | ACH | 850.00 | 09-12 | POS | 45.86 |
| 09-15 | ACH | 284.17 | 09-12 | POS | 134.80 |
| 09-19 | ACH | 35.00 | 09-12 | POS | 304.14 |
| 09-26 | ACH | 3,180.46 | 09-12 | POS | 2.18 |
| 09-29 | ACH | 910.63 | 09-12 | POS | 3.00 |
| 09-01 | POS | 159.90 | 09-12 | POS | 15.25 |
| 09-01 | POS | 16.50 | 09-12 | POS | 35.67 |
| 09-01 | POS | 79.19 | 09-12 | POS | 39.99 |
| 09-02 | POS | 7.59 | 09-13 | POS | 1,332.60 |
| 09-02 | POS | 9.95 | 09-15 | POS | 73.17 |
| 09-02 | POS | 42.62 | 09-15 | POS | 79.19 |
| 09-02 | POS | 78.73 | 09-15 | POS | 48.00 |
| 09-02 | POS | 185.00 | 09-16 | POS | 58.95 |
| 09-02 | POS | 564.70 | 09-16 | POS | 11.57 |
| 09-02 | POS | 3.00 | 09-16 | POS | 26.49 |
| 09-02 | POS | 8.25 | 09-16 | POS | 51.00 |
| 09-06 | POS | 8.32 | 09-16 | POS | 21.95 |
| 09-06 | POS | 12.25 | 09-19 | POS | 28.48 |
| 09-06 | POS | 36.43 | 09-19 | POS | 30.00 |
| 09-06 | POS | 50.52 | 09-19 | POS | 48.55 |
| 09-06 | POS | 145.50 | 09-19 | POS | 8.87 |
| 09-06 | POS | 268.14 | 09-19 | POS | 15.25 |
| 09-06 | POS | 356.14 | 09-19 | POS | 18.81 |
| 09-06 | POS | 2.13 | 09-20 | POS | 80.00 |
| 09-06 | POS | 3.00 | 09-26 | POS | 75.00 |
| 09-06 | POS | 7.48 | 09-27 | POS | 3,198.91 |
| 09-06 | POS | 7.50 | 09-28 | POS | 9.92 |
| 09-06 | POS | 7.96 | 09-28 | POS | 44.79 |
| 09-06 | POS | 2.50 | 09-28 | POS | 2.00 |
| 09-08 | POS | 73.72 | 09-29 | POS | 2.01 |
| 09-08 | POS | 125.00 | 09-29 | POS | 2.06 |
| 09-08 | POS | 272.95 | 09-29 | POS | 9.94 |
| 09-08 | POS | 392.00 | 09-29 | POS | 9.99 |
| 09-09 | POS | 39.17 | 09-29 | POS | 17.13 |
| 09-09 | POS | 59.64 | 09-29 | POS | 55.49 |
| 09-09 | POS | 192.00 | 09-30 | POS | 114.30 |
| 09-09 | POS | 2,500.00 | 09-30 | POS | 202.95 |
| 09-09 | POS | 9.58 | 09-30 | POS | 2,016.00 |
| 09-09 | POS | 11.91 | 09-12 | ATMO | 63.50 |

## Savings

### Business Savings - 3136408162

| Date | Transaction Detail | Amount($) | Balance($) |
|------|-------------------|-----------|-----------|
| 09-01 | Beginning Balance |  | 31.66 |
| 09-30 | Dividend | 0.01 | 31.67 |
| 09-30 | Ending Balance |  | **31.67** |



**NAVY FEDERAL**
**Credit Union**
PO Box 3000 • Merrifield, VA • 22119-3000
navyfederal.org

Statement Period
09/01/22 - 09/30/22

Access No. 15023979

**Statement of Account**
For JD MITCHELL TRANSPORT LLC

### Disclosure Information

- The interest charge on the Checking Line of Credit advances begins to accrue on the date an advance is posted to your account and continues to accrue daily on the unpaid principal balance.
- We calculate the interest charge on your account by applying the daily periodic rate to the "daily balance" of your account for each day in the billing cycle. To get the "daily balance" we take the beginning balance of your account each day, add any new advances or fees, and subtract any payments, credits, or unpaid interest charges.
- You may also determine the amount of interest charges by multiplying the "Balance Subject to Interest Rate" by the number of days in the billing cycle and the daily periodic rate. The "Balance Subject to Interest Rate" disclosed in the Interest Charge Calculation table is the "average daily balance." To calculate the "average daily balance" add up all the "daily balances" for the billing cycle and divide the total by the number of days in the billing cycle.
- If there are two or more daily periodic rates imposed during the billing cycle, you may determine the amount of interest charges by multiplying each of the "Balances Subject to Interest Rate" by the number of days the applicable rate was in effect and multiplying each of the results by the applicable daily periodic rate and adding the results together.

### What to Do if You Think You Find a Mistake on Your Statement

**Errors Related to a Checking Line of Credit Advance**

If you think there is an error on your statement, write to us at:
Navy Federal Credit Union, PO Box 3000, Merrifield, VA 22119-3000; or by fax, 1-703-206-4244.

You may also contact us on the Web: navyfederal.org.

In your letter, give us the following information:
- Account information: Your name and account number.
- Dollar amount: The dollar amount of the suspected error.
- Description of problem: If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us within 60 days after the error appeared on your statement.

You must notify us of any potential errors in writing (or electronically). You may call us, but if you do, we are not required to investigate any potential error, and you may have to pay the amount in question.

While we investigate whether or not there has been an error, the following are true:
- We cannot try to collect the amount in question or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your credit limit.

If we take more than 10 days in resolving an electronic transfer inquiry, we will provisionally credit your account for the amount in question so that you will have access to the funds during the time of our investigation.

**Errors Within Your Checking Account, Money Market Savings Account, or Savings Account**

In case of errors or questions about your electronic transfers telephone us at 1-888-842-6328, write us at the address provided above, or through Navy Federal Online Banking as soon as you can. If you think your statement or receipt is wrong or if you need more information about a transfer listed on the statement or receipt. We must hear from you no later than 60 days after we sent the FIRST statement on which the problem or error appeared.
- Tell us your name and account number (if any).
- Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.
- Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will provisionally credit your account for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation.

**Payments**

Your check must be payable to Navy Federal Credit Union and include your Checking Line of Credit account number. Include the voucher found at the bottom of your statement and mail the enclosed envelope to: Navy Federal Credit Union, PO Box 3100, Merrifield, VA 22119-3100. Payments received by 5:00 pm Eastern Time at the mail address above will be credited the same day. Mailed payments for your Checking Line of Credit account may not be commingled with funds designated for credit to other Navy Federal Credit Union accounts.